MUTUAL FUND INVESTORS, INC., a corporation, Mark Kruse, E. O. Garrett, Vernon Haddox, Jr., Lindsay Garnett, J. Bruce Taylor, Sr., Gilbert Shwanee, Plaintiffs-Appellants,

v.

The PUTNAM MANAGEMENT COMPANY, INC., a corporation, the George Putnam Fund of Boston, a voluntary association, the Putnam Growth Fund, a voluntary association, Putnam Investors Fund, Inc., a corporation, the Putnam Income Fund, Inc., a corporation, Putnam Fund Distributors, Inc., a corporation, Mutual Fund Associates, Inc., a corporation, Western Travelers Life Insurance Company, a corporation, Neil T. Ferguson, Edward J. Delehanty, Max Brumfield, Robert Johnson, Lowell B. Martin, Robert H. Gilbert, Defendants-Appellees.

No. 74-3359.

United States Court of Appeals, Ninth Circuit.

May 9, 1977.

Hunt, Liljestrom & Wentworth, J. Gary Germann, Santa Ana, Cal., for plaintiff-appellants.

Charles W. Bender, O'Melveny & Myers, Los Angeles, Cal., Godfrey L. Munter, Jr., Cotton, Seligman & Ray, San Francisco, Cal., for defendants-appellees.

Before WRIGHT, KILKENNY and ANDERSON, Circuit Judges.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

Appellants in this treble-damage antitrust action appeal from the entry of two summary judgments. The central question is the appropriateness of the summary judgment relief.

Mindful that summary judgments are disfavored in antitrust cases where motive or intent is critical, we are cognizant nevertheless that such relief, properly used, is a valuable means to avoid squandering judicial time and resources. Our careful review of the record leads inescapably to the conclusion that movants met their burden of proof, appellants failed to controvert that showing by producing any credible evidence from which a jury could infer the violations alleged and that the district court

prudently granted the motions for summary judgment.

## FACTS

The principal appellants are Kruse and Mutual Fund Investors, Inc. (MFI), a broker-dealer firm, founded by Kruse in 1966 while he was the manager of Mutual Fund Associates, Inc.'s (MFA) division offices in Santa Ana and Long Beach, California. Other appellants are MFI securities salesmen who were formerly employed by MFA.

Appellees are organizations and persons affiliated with the Putnam investment group. They include underwriters, consisting of The Putnam Management Co. and three of its subsidiaries, Putnam Fund Distributors, Inc. (Distributors), MFA, and Western Travelers Life Insurance Co. (Western Travelers). Also named are five Putnam mutual fund organizations: The George Putnam Fund of Boston, The Putnam Growth Fund, Putnam Investors Fund, Inc., The Putnam Income Fund, Inc. and Putnam Equities Fund, Inc.

Putnam Management is the investment adviser to the Putnam mutual fund groups. Distributor serves as the principal underwriter and national wholesale distributor of Putnam mutual fund securities. MFA, another wholly-owned subsidiary, operates as a broker-dealer selling mutual fund securities at retail to the public. Western Travelers is a life insurance company acquired by Putnam Management during the time covered by appellants' complaint.

The chain of events underlying this action is not complicated. Kruse surreptitiously decided to leave MFA in 1966 and found his own broker-dealer firm. He recruited MFA personnel, gathered selected MFA materials and data, and planned to transfer as much of MFA's Santa Ana division business as possible to MFI.

When discovered by MFA's regional manager in early November 1966, Kruse was discharged. He immediately opened MFI and took with him 13 MFA securities salesmen from the Santa Ana division who had accounted for 35 percent of that division's sales volume.

Two weeks later, MFA filed a state court complaint alleging unfair competition by MFI and Kruse. A temporary restraining order and a preliminary injunction were issued soon thereafter. The instant action was filed by appellants in April 1967 after the issuance of the state's preliminary injunction. The state court trial was held in 1968 and a judgment was entered against Kruse and MFI providing for a permanent injunction and compensatory and punitive damages.

On January 3, 1967, during the pendency of the state court litigation, Kruse requested a sales agreement with Distributors for MFI. George Putnam, president of Putnam Management and Chairman of the Board of Distributors, previously had decided not to sell Putnam fund securities through MFI until the state court proceedings were completed. Consequently, Kruse's request was rejected. Once the taking of evidence in the state court case was completed in May 1967, Putnam Distributors entered into a sales agreement with MFI.

Count I alleges a combination and conspiracy to restrain and monopolize trade under the Sherman Act [15 U.S.C. §§ 1, 2] in the sale of mutual fund securities and life insurance policies in the western states, California, and southern California beginning prior to November 7, 1966 (the date of Kruse's termination by MFA). Appellants contend that the circumstances surrounding Kruse's termination, the filing of the state court action by MFA Distributors' refusal to deal, and appellees' acts of disparagement, false complaints to regulatory agencies, and attempts to prevent appellants' licensing prove the allegations. Count I also alleges an attempt to monopolize in violation of 15 U.S.C. § 2.

Count II charges violations of §§ 1 and 2 beginning in 1961, incorporates by reference the allegations above, and focuses on (a) Putnam's acquisitions of MFA and Western Travelers and (b) the techniques used by MFA to increase the sales of Putnam mutual fund securities.

**624**

## DISCUSSION

### 1. SUMMARY JUDGMENT.

■ It is axiomatic that the moving party must sustain the burden of demonstrating "the absence of a genuine issue as to any material fact," pursuant to Rule 56; F.R.Civ.Pr. A material issue is one which may affect the outcome of the litigation. A genuine issue supporting a claimed factual dispute requires a judge or jury to resolve the parties' differing versions of the truth at trial. *First National Bank of Arizona v. Cities Service Co., Inc.*, 391 U.S. 253, 288–289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). This burden is particularly rigorous in antitrust cases. *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 280 (9th Cir. 1976).

■■ If the movants' papers are sufficient to support the motion, the opposing party must controvert the showing. In doing so, all evidence and inferences therefrom are to be construed in the light most favorable to the party opposing the motion. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Nevertheless, the opponents' version of the facts must support a viable legal theory which would entitle them, if accepted, to a judgment as a matter of law. *See, e. g., Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972); *McGuire v. Columbia Broadcasting System, Inc.*, 399 F.2d 902, 905 (9th Cir. 1968).

As we pointed out earlier, the drastic nature of summary judgment relief has created a disfavored status for such dispositions in complex antitrust litigation where motive and intent are important. *See, e. g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Norfolk Monuments Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969). The often cited *Poller* case, however, has become a magic wand waved indiscriminately by those opposing summary judgment motions in antitrust actions. We note that the Court in *Poller* cautioned only that summary judgment "be used sparingly. . . .", *Poller, supra*, 368 U.S., at 473, 82 S.Ct. 486, and not that such relief is inappropriate in all antitrust cases.

■■ The Court, in fact, has specifically held that an opposing party may not defeat a summary judgment motion, once the movant has met his burden, in the absence of "any significant probative evidence tending to support the complaint." *Cities Service, supra*, 391 U.S. at 290, 88 S.Ct. at 1593. We have cast this rule in the following terms:

> Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper.

*ALW, Inc. v. United Airlines, Inc.*, 510 F.2d 52, 55 (9th Cir. 1975). To hold otherwise would give free rein to any plaintiff who can draft an antitrust complaint capable of withstanding a motion to dismiss to go to trial with only a wing and a prayer supporting his well drafted complaint.

Counsel for appellants agreed in open court that a trial in this matter would not develop additional evidence beyond that before the district court when summary judgment was granted. Moreover, it was conceded that the facts are undisputed and what is at issue on appeal are the inferences to be drawn from those facts.

■ Generally, when intent is at issue, a jury should be allowed to draw its own inferences from the undisputed facts unless all reasonable inferences defeat appellants' claims. The motions and record here indicate that all reasonable inferences do defeat a viable legal theory upon which appellants might prevail.

After appellees made their sufficient showing, appellants chose to file no affidavits in opposition to movants' papers "because the factual bases for the [appellants'] opposition are amply set forth in the affidavits filed by [appellees] and by deposition testimony of [appellees] representatives." C.T. 798, n.1.

, Although appellants have the right to rest their opposition to the motion on admissible evidence in the record, the Supreme Court has observed that: "[i]t has always been perilous for the opposing party neither to proffer any countering evidentiary materials nor file a 56(f) affidavit", *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142 (1970) *quoting* 6 J. Moore, Federal Practice, ¶ 56.-22[2], p. 2824 (2d ed. 1966). A thorough examination of the materials cited by appellants reveals only threadbare conclusory statements instead of "significant probative evidence."

█ Additionally, appellees cite us to Rule 3(g)(3) of the Local Rules for the Central District of California, providing:

. In determining any motion for summary judgment, the court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by affidavit filed in opposition to the motion.

Local rules may be adopted by the district court under Rule 83 of the Federal Rules of Civil Procedure if they are not inconsistent with the federal rules. *See, e. g., Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976).

█ As we observed in *Hamilton,* Rule 56 of the federal rules provides that a party opposing a summary judgment motion need not file contravening affidavits where the movants' own papers demonstrate the existence of a genuine issue of material fact. *Id.* at 686, *citing Island Equipment Land Co. v. Guam Economic Development Authority*, 474 F.2d 753 (9th Cir. 1973); Advisory Note of 1963 to Subdiv. (e), Rule 56.

The district court did not rest its order on this ground but rather examined the whole record. As a result, we need not resolve the apparent disparity between Rule 56 and Local Rule 3(g), but again we caution that it is highly questionable whether the district court can mandate the entry of summary judgment solely on the failure of the adverse party to file opposing papers "where the movant's papers are themselves insufficient . . . or on their face reveal a genuine issue of material fact." *Hamilton, supra,* 539 F.2d, at 686 n.1; *see also Wang v. Lake Maxinhall Estates, Inc.*, 531 F.2d 832, 835 n.10 (7th Cir. 1976) (Stevens, J.).

## 2. INTRAENTERPRISE CONSPIRACY.

█ An antitrust conspiracy, no less than other proscribed conspiracies, requires a plurality of actors concerting their efforts towards a common goal. Appellants challenge the district court's conclusion that the appellees were vertically integrated members of the same corporate group whose actions could not be treated as an intraenterprise conspiracy.

The antitrust cases determining the existence or absence of any intraenterprise conspiracy, when taken collectively, resemble a thaumatrope. Rules seemingly clear on their face become an unresolved conceptual blur when applied to the variant fact situations presented by diverse economic entities and functional structures. *See, e. g., Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 801–803 (9th Cir. 1976).

█ The Supreme Court repeatedly has held that "common ownership and control does not liberate [two separately incorporated subsidiaries within the same corporate family] from the impact of the antitrust laws . . . especially . . . where [they] hold themselves out as competitors." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). *Accord, Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

In *Knutson,* we struggled with the underlying problem of defining an economic unit and the ancillary problem of determining the effect of a given corporate structure. In dictum we recognized that, at least where the corporations are horizontally related, separate incorporation may not defeat the need for substance to prevail over form when only a single business unit ex-

ists. *Knutson, supra,* 548 F.2d 802–803. Separate incorporation, like the lack of intraenterprise competition, is not dispositive of the question, but only one factor in the calculus.

This recognition finds additional albeit somewhat cryptic, support in *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116, 95 S.Ct. 2099, 2117, 45 L.Ed.2d 41 (1975), where the Court reiterated that: "[t]he corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act", *citing United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

We need not apply the *Knutson* criteria here because a jury or judge could not reasonably infer that the evidence demonstrates the existence of a conspiracy.

The elements of the violation alleged are (a) the existence of a conspiracy or combination in restraint of trade (b) which restrains a significant line of interstate commerce and (c) causes damage to the plaintiffs' property as a result of the violation.

■ We do not quarrel with appellants' insistence that the alleged conspiracy should not "be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), *quoting United States v. Patten,* 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 (1913). Even so, the only allegations in Counts I and II which merit further discussion are the allegations of a refusal to deal and an attempt to monopolize.

a. *Refusal to Deal.*

■ This circuit adheres to the rule that a corporation has the right to deal with whom it pleases and to select its customers, provided there is no effect which contravenes the antitrust laws. *See, e. g., Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1220 (9th Cir. 1977); *Ricchetti v. Meister Brau, Inc.,* 431 F.2d 1211, 1214 (9th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).

■ The critical question in refusal to deal cases is "whether the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade." *Alpha Distrib. Co. of California, Inc. v. Jack Daniel Distillery,* 454 F.2d 442, 452 (9th Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 77–78 (9th Cir. 1969).

■ Additionally, the Supreme Court has made clear that not all refusals to deal are presumptively illegal:

> [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers . . . . If the restraint stops at that point—if nothing more is involved than vertical 'confinement' . . . ., and if competitive products are readily available to others, the restriction, . . . ., would not violate the Sherman Act.

*United States v. Arnold Schwinn & Co.,* 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967).

■ Appellants attempt to obviate this doctrine by arguing that Distributors' refusal to deal was instigated by MFA and constitutes a *per se* boycott under the rationale of *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Their argument misperceives the nature and reach of presumptive illegality. At issue is an alleged conspiracy among vertically integrated organizations, and agreements among them are not *per se* illegal. *See, e. g., Arnold Schwinn & Co., supra,* 388 U.S., at 372–73, 87 S.Ct. 1856; *Alpha Distrib. Co., supra,* 454 F.2d, at 452. In the absence of any showing of an anticompetitive effect or motive this situation is controlled by our holding in *Hawaiian Oke,* 416 F.2d, at 76–80, that the *per se* boycott line of cases is inapplicable.

Although appellees' affidavits rebut the claim of intraenterprise collusion to boycott MFI, appellants nevertheless assert two arguments with respect to the mutual fund

appellees. First, they contend that appellees' "acquiescence" in Distributors' refusal to deal constitutes the requisite showing of participation in the conspiracy. Second, they assert that participation by the mutual funds can be demonstrated by the fact that they are dominated by Putnam Management and therefore answerable for its conduct. The record, on the contrary, reveals that none of the five mutual funds exercised its judgment approving Distributors' refusal to deal or colluded illegally with Distributors and MFA.

The undisputed facts also show there was no unreasonable restraint of trade. For example, there was a wide variety of alternative sources of supply available. In fact, MFI sold the securities of 26 other mutual fund groups in 1967, and 42 in 1968.

Finally, without a tenable *per se* boycott theory, appellants must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory. Appellants point to the alleged injury to their businesses, but fail to provide any evidence that the "effect upon competition in the marketplace is substantially adverse." *Arnold Schwinn & Co., supra,* 388 U.S., at 375, 87 S.Ct. at 1863. As the Court emphasized in *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the antitrust laws protect "competition, not competitors. . ."

### b. *Attempt to Monopolize.*

A viable legal theory of attempt to monopolize must demonstrate "a specific intent to destroy competition or build [a] monopoly . . ." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). This circuit requires "(1) only specific intent and (2) some illegal (under Section 1) or predatory activity from which specific intent can be inferred." *Knutson v. The Daily Review, Inc.,* 548 F.2d 795, 814 (9th Cir. 1976). *See also Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

Nothing in the record supports appellants' contentions that Putnam's actions or its acquisitions of MFA and Western Traveler's were inspired by a monopolistic intent. George Putnam's motive in refusing to deal with MFI during the pendency of the State court litigation clearly was to prevent the destruction of MFA's sales organization by the unlawful conduct of Kruse and MFI. This was a reasonable business practice unaccompanied by monopolistic or predatory intent.

The evidence further reveals no illegal or predatory activity from which it can be inferred that Putnam has sufficient power to control prices or exclude competitors. For instance, during the relevant period, MFA's mutual fund sales in California comprised only two to three percent of the total mutual fund sales in California.

Sales of Putnam Fund securities provide no support either. Only three percent of the mutual fund sales in the United States in 1966–67 were of Putnam Fund securities and, during the same period, Putnam Fund sales in the California market accounted for only four percent of the total sales.

Finally, we are not dealing with a concentrated industry. From a horizontal perspective, the broker-dealers in the relevant market number in the hundreds. From a vertical perspective, there were numerous alternative sources of supply for mutual fund securities. As we observed earlier, the record discloses that MFI sold the securities of 26 other mutual fund groups in 1967, and 42 in 1968.

Without specific factual support from which a jury could infer the proscribed intent or motive, and in the absence of a sustainable legal theory, appellants' conclusory allegations could not withstand the motions for summary judgment. The district court's grants of summary judgment were fully warranted.

AFFIRMED.