DETERMINED PRODUCTIONS, INC., a corporation; Determined Productions, (H.K.) Ltd., a corporation, Plaintiffs,

v.

R. DAKIN & COMPANY, a corporation, Defendant.

R. DAKIN & COMPANY, a corporation, Counterclaimant,

v.

DETERMINED PRODUCTIONS, INC., a corporation; Determined Productions, (H.K.) Ltd., a corporation, Counterclaim Defendants.

No. C–78–2785–WWS.

United States District Court, N. D. California.

Nov. 26, 1979.

Steven J. Cannata, Alioto & Alioto, San Francisco, Cal., for plaintiffs.

Mark J. LeHocky, Broad, Khouri & Schulz, San Francisco, Cal., for defendant.

## MEMORANDUM OF OPINION AND ORDER

WILLIAM W SCHWARZER, District Judge.

This is an action for monetary and injunctive relief charging defendant with violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), inducing breach of contract and interfering with advantageous relations. Defendant has denied the charges and filed a counterclaim. Before the Court is defendant's motion for summary judgment on the antitrust claims against it.

This being a motion for summary judgment, we must resolve all factual disputes in plaintiffs' favor and view the facts presented in the light most favorable to plaintiffs. *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir. 1977). So viewed, the facts controlling the disposition of this motion may be briefly stated.

Both plaintiffs Determined Productions, Inc., and defendant Dakin & Co. are engaged in marketing stuffed toy animals and dolls throughout the world. For some years, Dakin has contracted the manufacture of certain of its products to a Korean manufacturer named Star Wangu Company, Ltd., the largest such manufacturer in Korea. Between 1968 and 1973, Determined contracted with Dakin for the exclusive manufacture of Determined's plush toy products by Dakin's contractor. Between 1973 and 1975, Determined used Dakin as a nonexclusive source. Beginning in 1975, Determined began to deal directly with Dakin's supplier Star Wangu in Korea. When Dakin learned of Determined's move, it expressed its disapproval both to Determined and Star Wangu. In view of Dakin's announced position, Determined and Star Wangu entered into a secret arrangement under which the latter manufactured products for Determined at a separate facility. In August 1978, Dakin discovered this arrangement and in substance directed Star Wangu to cease dealing with Determined or lose Dakin's business. Star Wangu terminated its relationship with Determined and thereafter dealt exclusively with Dakin.

Determined contends that Dakin's threat to withdraw its business from Star Wangu unless Star ceased doing business with Determined "is in clear violation of Section 1 of the Sherman Act and constitutes a group boycott or concerted refusal to deal which is a *per se* violation of the antitrust laws." (Plaintiffs' Opposition Memorandum at 22)

We must begin with the well-settled proposition that a trader has the right to deal or refuse to deal with whomever he pleases for reasons sufficient to himself. *United States v. Colgate*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Eastern States Retail Lumber Dealers' Assoc. v. United States*, 234 U.S. 600, 614, 34 S.Ct. 951, 955, 58 L.Ed. 1490 (1914). A refusal to deal is not unlawful unless it implements an arrangement to restrain trade by, for example, enforcing price maintenance, barring a competitor from a market or maintaining a dominant market position. *See, Bushie v. Stenocord*, 460 F.2d 116, 119 (9th Cir. 1972).[1]

---

1. An example is *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir. 1979), on which plaintiffs rely here. That case held that summary judgment should not have been granted where plaintiff, a retailer of building supplies, alleged that defendant, a manufacturer of kitchen cabinets refused to continue to supply it pursuant to a conspiracy with one of plaintiff's competitors. It was alleged that the termination occurred as a result of the competitor's complaint about plaintiff's discount pricing. The court considered the termination of a retailer at the instance of a competing retailer to result in a horizontal arrangement, aggravated in this case by the price maintenance motivation. The resulting restraint was found to be analogous to that condemned in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), and susceptible to application of the *per se* rule. This case is obviously of no help to plaintiff here, in the absence of any evidence of horizontal impact, much less of price implications. *Cf.* note 2, *infra*.

Plaintiffs also rely on *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir. 1976), in which the court, among other things, reversed a summary judgment for defendants based on an alleged Sherman Act conspiracy between Volkswagen and an independent distributor of automobile air conditioners to cease distributing air conditioners produced

No such claim is made here and the facts would not support it.

 Nevertheless Determined argues that a vertical agreement not to deal with another constitutes a boycott. Its argument is based on a misreading of the law. A boycott generally involves concerted action, normally by competitors or by suppliers or customers of the affected firm, having the purpose or effect of barring a trader's access to a market. *See, Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178–80 (D.C. Cir.1978), L. Sullivan, Antitrust 232 (1977).[2] The concert may be instigated by vertical action, as in *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) and *United States v. General Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), or by horizontal action, as in *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). *See, also, Ackerman-Chillingworth v. Pacific Electrical*, 579 F.2d 484, 490 (9th Cir. 1978) *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). But a mere vertical agreement under which a supplier is required to deal exclusively with its customer has never been held to be a boycott. *See, e. g., Gough v. Rossmoor Corp.*, 585 F.2d 381 (9th Cir. 1978) *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979) (agreement between local newspaper and a retailer who was plaintiff's competitor to bar plaintiff from advertising in that newspaper not a per se violation); *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620 (9th Cir. 1977) (agreement between mutual fund manager and its brokerage firm not to permit shares to be sold by plaintiff broker not a *per se* violation); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969) (agreement by several liquor manufacturers to terminate plaintiff and substitute a new distributor not a *per se* violation).

Rejection of Determined's contention that the Dakin-Star arrangement is illegal

by plaintiff. That case must, however, be read in the context in which it arose, i. e., an acquisition by Volkswagen of another manufacturer of air conditioners, alleged to violate Section 7 of the Clayton Act. The Court specifically stated "that the § 7 damage claims and the Sherman Act claims against Distributor, VW and [VW's manufacturing] Subsidiary are all interrelated." 532 F.2d at 684, n. 13; *see, also*, 532 F.2d at 682. In the context of that case, the alleged vertical conspiracy to exclude plaintiff from supplying air conditioners to Volkswagen's independent distributor could have been found to have a tendency to exclude plaintiff from the significant market or submarket for Volkswagen—compatible air conditioners. The case is of no help to plaintiff here, in the absence of any facts indicating an impact on competition in a market.

2. Plaintiffs cite Sullivan for the proposition that "it is conceivable that only a single firm at the blockaded level may succeed in coercing or inducing suppliers or customers (or, for that matter, one important supplier ...) from dealing with ... would-be competitors ..." Sullivan, Antitrust 231. The only case cited, however, is *Klor's* in which a single firm induced concerted action by manufacturers and distributors not to deal with plaintiff. Moreover the observation should be read in context with the following statement appearing at pages 261–62:

Now suppose that plurality is lacking at each of these levels and that a retailer, such as the defendant in *Klor's*, seeks to protect itself from competition by inducing a single supplier, a manufacturer of TVs, to sell only to it. *Klor's* in a pointed dictum tells us that the holding in that case does not reach such an arrangement, usually called an exclusive distributorship. A single firm, hoping to attain competitive advantage, apparently can induce at least one supplier to deal only with it without falling under the shadow of the *per se* rule concerning boycotts. The distinction does not turn upon the lack of enough concerted action to constitute a contract, combination or conspiracy. The agreement between the manufacturer and the dealer supplies that. The distinction can be rationalized, broadly, by reference to the fact that if a buyer ties up only one supplier, firms seeking to compete with the buyer will still have access to suppliers of other competing goods. Indeed, the Supreme Court has implied by way of dicta that the legality of such an exclusive franchise, or exclusive dealership as it is sometimes called, depends upon availability of substitutes.

An exclusive franchise is, of course, a vertical restraint; a buyer imposes on the seller a restriction on the seller's market conduct. It can be best analyzed and understood in relation to similar restraints where a firm at one horizontal level imposes restrictions upon firms at other horizontal levels from which the first firm buys or to which it sells. Here, then, we shall leave the matter, having noted only that the boycott rule does not apply; ...

*per se* leaves open the question whether it may nevertheless be found to violate the rule of reason. Dakin has made a substantial showing in support of its contention that the arrangement was justified by business reasons and must therefore be held to be reasonable as a matter of law. It is not necessary, however, to reach this issue.

Inasmuch as the Dakin-Star arrangement is not unlawful *per se* and has not been shown to implement a restraint of trade such as price fixing or market domination, Determined must show that there is a triable issue of fact respecting the existence of an unreasonable restraint of trade. *Mutual Fund Investors v. Putnam Management Co., supra,* 553 F.2d at 624. This "involves a consideration of the impact of the restraint on the competitive conditions within the field of commerce in which the plaintiff was engaged and upon those commercially engaged in competition within it." *Gough v. Rossmoor Corp, supra,* 585 F.2d at 389. Plaintiff must therefore come forward with evidence of the relevant market. Failure to do so entitles defendant to judgment. *Id.,* 585 F.2d at 389.

■ Not only has Determined produced no such evidence, but the undisputed facts before the Court establish that manufacturers of stuffed toys exist throughout the world. Determined has itself used, or considered using plush toy manufacturers in Japan, Hong Kong, France, Italy, Spain, Mexico, Haiti and the People's Republic of China. It concedes that several hundred manufacturers exist in Korea alone, of which a number are capable of meeting Determined's needs. Determined points to financial and quality problems with many manufacturers, but does not dispute that satisfactory suppliers can be developed with training and supervision supplied by the buyer. It also points to the need for trained embroidery workers available at Star Wangu, but Star has had to train its employees and has to continue to do so; there is, moreover, a large pool of embroidery workers available in Korea and Star has offered to train workers for Determined. Thus, the indisputable existence of alternate sources of supply negates any anti-competitive inference from the Dakin-Star arrangement.[3]

It may well be true, as plaintiffs argue, that Dakin has succeeded in tying up the best, most efficient and cheapest source of supply in Korea. Implicit in plaintiffs' position appears to be the claim that the antitrust laws require a firm to share with its competitors the fruits of its superior acumen and industry. This is a novel doctrine which, if accepted, would undermine the purpose of the antitrust laws which is to protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ Inasmuch as Determined's federal law claims must therefore be dismissed, the Court may in its discretion dismiss the pendent state claims, *United Mine Workers of*

---

**3.** *See, United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967):

At the other extreme, a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. Cf. *United States v. Colgate & Co.,* 250 U.S. 300 [39 S.Ct. 465, 63 L.Ed. 992] (1919). If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act. It is within these boundary lines that we must analyze the present case.

*Moore Oil Co. v. Union Oil Co.,* 599 F.2d 1299 (4th Cir. 1979), cited by plaintiffs in this connection is not in point here. That case held that defendant was not entitled to summary judgment on the ground that plaintiff had alternate sources of supply where the charge was that plaintiff's contract had been cancelled pursuant to a conspiracy among a group of oil companies.

Although the complaint charges a violation of Section 2 as well as Section 1, neither side has raised any Section 2 issue in connection with the motion for summary judgment, and plaintiffs' showing does not meet the minimum requirements. *See, Gough v. Rossmoor Corp., supra,* 585 F.2d at 389–91.

*America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), including the counterclaims which are based on state law. *See, National Research Bureau, Inc. v. Bartholomew*, 482 F.2d 386, 388 (3rd Cir. 1973); *Wetherington v. Phillips*, 380 F.Supp. 426, 429 *aff'd*, 526 F.2d 591 (4th Cir. 1975); *United States v. Gregor J. Schaefer Sons, Inc.*, 272 F.Supp. 962 (E.D.N.Y.1967); 3 Moore's Federal Practice ¶ 13.15[1] (2d ed. 1979).

The parties urge the Court to retain jurisdiction as a matter of economy and efficiency. Upon reflection, the Court declines the invitation. Other things being equal, it is preferable for state law claims to be adjudicated by state courts. While it may be true that the case is substantially ready for trial, the federal court preparation is equally useable in the state courts which, upon the filing of a joint certificate of readiness by the parties, may well set an early trial date. In weighing considerations of economy, moreover, the Court must be mindful of the increasingly heavy demands upon its limited resources. The facts before the Court reflect competitive action by plaintiffs and defendant which was vigorous but within the bounds of legality. The Court perceives no wrongs to right or injury to cure warranting exercise of its discretion to retain jurisdiction.

Accordingly, defendant's motion for summary judgment on the Sherman Act claims will be granted and the remaining claims of the complaint and defendant's counterclaims will be dismissed without prejudice.

IT IS SO ORDERED.