CASCADE CABINET CO.,
Plaintiff-Appellant,

v.

WESTERN CABINET & MILLWORK INC., Milton Skutle & Jane Doe Skutle, American Prefinish Corp. and Donald McDonald & Jane Doe McDonald, Defendants-Appellees.

No. 82–3262.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 1983.

Decided July 5, 1983.

James D. Nelson, Seattle, Wash., for plaintiff-appellant.

Terrence C. Brown, Seattle, Wash., for defendants-appellees.

Before WALLACE, ANDERSON, and SCHROEDER, Circuit Judges.

WALLACE, Circuit Judge:

Cascade Cabinet Company (Cascade) appeals from a summary judgment. The district court held that Cascade had failed, as a matter of law, to establish a violation of either section 1 or section 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. We affirm.

I

Viewing the evidence in the light most favorable to Cascade, we accept as true the following version of the facts. Timberland Industries, Inc. (Timberland)[1] controls a substantial part of the market for modular kitchen and vanity cabinets in western Washington. During a period of remarka-

---

1. While there is some confusion in the record, it was indicated at oral argument that Western Cabinet Company is a division of Timberland and that Timberland is the proper defendant.

ble success in the late 1970s, Timberland outgrew its cabinet manufacturing plant in Kirkland, Washington and constructed a larger plant in Woodinville, Washington. Timberland vacated the Kirkland plant, and American Prefinish Corporation (American), a manufacturer of interior millwork and lumber, leased the premises. The president of American, McDonald, was formerly the chairman of the board and president of Timberland. McDonald's brother is currently president of Timberland. Because the new Woodinville plant was constructed with state of the art technology, Timberland left most of the leasehold improvements in the Kirkland plant intact.

Cascade, a newly formed producer of modular kitchen cabinets, obtained its first order in late 1980, a $330,000 contract which had to be completed in February 1981. Anxious to find a site from which to conduct business, Holan, president of Cascade, visited the Kirkland plant and spoke with McDonald about subleasing the space. The facilities were ideally suited for Cascade's needs because they already contained many improvements required for the manufacture of modular cabinets, such as dust collecting systems, paint booths, fire sprinkling equipment, loading docks, and special wiring.

Negotiations followed, and Holan and McDonald reached an oral agreement upon all material terms. Before they reduced the agreement to writing, however, Timberland intervened. Skutle, president of the Western Cabinet and Millwork division of Timberland, telephoned McDonald and advised him that Timberland would prefer that the abandoned plant not be sublet to Cascade and that Timberland might be interested in leasing the premises again. After the telephone conversation, McDonald told Holan that American would not lease the facilities to Cascade. Holan objected, but to no avail. Cascade alleges that the refusal to lease the premises was motivated by American's desire to maintain the goodwill of Timberland, its largest customer. Timberland did not lease the plant and Cas-

cade alleges Timberland never intended to lease it. Cascade has produced some evidence tending to show that Timberland pressured American not to sublease to Cascade because Timberland did not want a new competitor to gain such an advantageous lease.

Cascade obtained an alternate site, but was unable to take possession until late January and incurred substantial expenses in installing improvements. It fulfilled its order on time, but only by subcontracting out parts of the project at a higher rate than it would have cost had Cascade handled those portions of the project itself. Cascade claims that American's refusal to lease the Kirkland facilities has damaged it in the amount of $500,000.

Cascade filed this action in federal district court against Timberland, Skutle and his wife, American, and McDonald and his wife. It alleged a concerted refusal to deal and attempted monopolization in violation of sections 1 and 2 of the Sherman Act. Cascade also alleged pendent state claims for violation of Washington antitrust, contract, and tort law. A summary judgment of dismissal as to all claims was entered in favor of the defendants, and Cascade filed a timely notice of appeal. Cascade appeals only the federal antitrust claims. Our jurisdiction rests on 28 U.S.C. § 1291.

## II

We must determine whether the conduct by Timberland and American in denying Cascade an advantageous lease violated the Sherman Act. Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *E.g., Mutual Fund Investors, Inc. v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir.1977) (*Mutual Fund Investors*). We must view the evidence in the light most favorable to the party opposing the motion for summary judgment. *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bu-*

*reau,* 701 F.2d 1276, 1281 (9th Cir.1983) (*Klamath-Lake*).

## III

■ We begin by analyzing Cascade's claim under section 1 of the Sherman Act. Section 1, which prohibits concerted activity "in restraint of trade," has been analyzed under both the "rule of reason" and the "per se" rule. The rule of reason, "[a]s its name suggests, ... requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982) (footnote omitted). The per se rule's conclusive presumption of illegality is not applied to a challenged practice until "experience with [the] particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Id.* at 344, 102 S.Ct. at 2473. The Supreme Court described the per se violations of the Sherman Act in *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), as "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Cascade challenges the defendants' conduct under both the rule of reason and the per se rule.

### A.

Thus far, the Supreme Court and this court have applied the per se rule to four categories of restraints: horizontal and vertical price fixing, horizontal market division, group boycotts or concerted refusals to deal, and tying arrangements. *A.H. Cox &*

*Co. v. Star Machinery Co.,* 653 F.2d 1302, 1305 (9th Cir.1981); *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).[2] Cascade argues that the defendants' conduct constitutes a concerted refusal to deal.

American did refuse to deal with Cascade in the sense that it refused to lease Cascade the Kirkland facilities, and we may assume, for purposes of this appeal, that a concert of action between Timberland and American caused this refusal to deal. Cascade and Timberland agree that they are horizontal competitors; Cascade concedes that American is not a horizontal competitor of either Timberland or Cascade. Concerted activity between Timberland and American thus does not fit within the limits of a conventional boycott:

> In a conventional boycott, traders at one level (let us say wholesalers) seek to protect themselves from competition from nongroup members who are competing or who are seeking to compete at that level. They do this by taking concerted action aimed at depriving the excluded wholesalers of some trade relationship which they would need to compete effectively at the wholesale level.

L. Sullivan, *Handbook of the Law of Antitrust* 230 (1977).

In prior cases, we limited the per se rule against concerted refusals to deal to concerted activity between two or more horizontal competitors and refused to apply the rule to concerted activity between vertically related companies, even though one of them may have been the plaintiff's horizontal competitor. For example, in *Gough v. Rossmoor Corp.* a single horizontal competitor (Crestmark) of the plaintiff (Rosen) in the market for selling carpets to residents of Rossmoor Leisure World, a housing development for retired adults, conspired with the publisher of the Leisure World News, a

---

**2.** For a list of the Supreme Court precedents in each category, see *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 nn. 3–6 (9th Cir.1978), *cert.*

*denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).

community newspaper, to prevent Rosen from advertising in the paper. Although the plan was clearly intended to harm Crestmark's competitor, we analyzed the practice as follows:

Such concert of action may suffice to create a conspiracy but it cannot suffice to constitute such a concerted refusal to deal as has so far been held to be *per se* unreasonable. In all cases so far holding such restraints to be *per se* unreasonable, there has been some horizontal concert of action taken against the victims of the restraint. In *Mutual Fund Investors v. Putnam Management Co., supra,* this court rejected the contention that the refusal to deal there under fire constituted a *per se* illegal group boycott, stating "At issue is an alleged conspiracy among vertically integrated organizations and agreements among them are not *per se* illegal." 553 F.2d at 626.

585 F.2d at 387 (footnote omitted).

Not surprisingly, defendants rely on *Gough v. Rossmoor Corp.* Although we have stated that vertical concert of activity is not per se unreasonable, some recent cases have carved out a limited exception to this rule. Recently, we stated that "[t]o establish a per se violation of section 1 [for refusal to deal], a plaintiff *generally* must show that the defendant engaged in concerted anticompetitive activity with others at the same level of market organization." *General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 978 (9th Cir.1983) (*General Business Systems*) (emphasis added). The word "generally" is significant because we then stated that a refusal to deal instigated by a single horizontal competitor and a vertically related company, in appropriate circumstances, may come within the per se rule:

Restraints solicited by a distributor but implemented by a manufacturer are not automatically per se violations. [*A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306 (9th Cir.1981)]. Restraints of this type come within the per se rule only if they "clearly had, or [were]

likely to have, a pernicious effect on competition and lacked any redeeming virtue." *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors,* 637 F.2d 1376, 1386–87 (9th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981), *see, e.g., Betaseed, Inc. v. U & I Inc.,* 681 F.2d 1203, 1235 (9th Cir.1982).

*General Business Systems,* 699 F.2d at 978.

■ The per se rule should never be applied automatically when the concerted refusal to deal is vertical rather than horizontal. *See A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d at 1306. Indeed, generally, it will not be applied. *General Business Systems,* 699 F.2d at 978. To determine whether a case fits within the limited exception to the general rule, we must ask whether the particular restraint has such a "pernicious effect on competition and [is so lacking] of any redeeming virtue," *Northern Pacific Railway v. United States,* 356 U.S. at 5, 78 S.Ct. at 518, that the conclusive presumption of the per se rule is warranted.

■ Following the guidelines we established in *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030 (9th Cir.1983) (*Northrop*), we conclude that it is inappropriate to apply the per se rule to the circumstances of this case. The critical inquiry in deciding whether to extend per se condemnation to conduct which does not fit easily within the limits of previously recognized per se categories is whether the "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Northrop,* at 1052, *quoting Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). In conducting this inquiry, we follow the Supreme Court's admonition that "departure from the rule-of-reason standard must be based upon demonstrable economic effect . . . ." *Northrop,* at 1052, *quoting Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977).

■ It is at this juncture that Cascade fails in its bid to establish a per se violation of section 1 of the Sherman Act. Cascade has failed to show any adverse effect upon competition. It is undisputed that Cascade. was able to enter the market for modular kitchen cabinets and even completed its first contract on time. Although Cascade claims damages as a result of the conduct of American and Timberland, injury to a single competitor does not constitute injury to competition. *E.g., Klamath-Lake,* 701 F.2d at 1292; *Gough v. Rossmoor Corp.,* 585 F.2d at 386; *cf. Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256, 1259 (9th Cir.1981) (holding that plaintiff's injury was not the result of conduct forbidden by the antitrust laws), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). Cascade does not allege that it was unable to lease other commercial space or that Timberland interfered with its attempts to lease other space. Indeed, Cascade does not allege that Timberland had market power in the real estate market. To apply the per se rule, we would have to conclude that Timberland's successful effort to prevent Cascade from leasing the Kirkland plant is the kind of restraint that "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Northrop,* at 1052, *quoting Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. at 19–20, 99 S.Ct. at 1562. We cannot make such a generalization, particularly in a case in which no harm to competition is shown.

■ Even if Cascade had shown that the restraint had injured competition, we would be reluctant to apply the per se rule because of the lack of judicial experience with the challenged conduct. "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. at 9, 99 S.Ct. at 1557; *quoting United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

■ Cascade argues that it need not prove anticompetitive effect and that it is sufficient to show anticompetitive purpose. We have stated that "[t]he critical question in refusal to . deal cases is 'whether the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade.' " *Mutual Fund Investors,* 553 F.2d at 626, *quoting Alpha Distributing Co. v. Jack Daniel Distillery,* 454 F.2d 442, 452 (9th Cir.1972). Cascade, however, misperceives the meaning of this statement. When the plaintiff establishes that the defendants engaged in conduct clearly falling within one of the categories to which the per se rule applies, it is not necessary to show actual anticompetitive effect; such effect is presumed. *See Northern Pacific Railway v. United States,* 356 U.S. at 5, 78 S.Ct. at 518. Thus, in establishing that the challenged conduct fits within one of the per se categories, it is often enough for the plaintiff to show that the defendants acted with anti-competitive purpose or, in other words, that the defendants intentionally engaged in conduct which, if carried out as planned, would always or almost always adversely affect competition, thus warranting application of the per se rule. *Cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 76–78 (9th Cir.1969) (interpreting anticompetitive purpose as acting with the objective to accomplish some anticompetitive effect), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Although Timberland may have acted with the motive of making things difficult for Cascade, such subjective intent does not constitute anticompetitive purpose within the meaning of our prior cases.

None of the cases cited by Cascade supports application of the per se rule to these circumstances. The group boycott in *Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982), injured competition by eliminating one of the companies who wanted to compete on the bid for a school project. *Id.* at 409. The conspiracy alleged in *Klor's,*

*Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), also was shown to have an adverse effect on competition because it effectively eliminated the plaintiff from the relevant market. Likewise, in *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979), the court found that the refusal to deal eliminated a competitor at the retail level of the relevant market and that the motivating factor of the conspiracy was to reduce price competition. *Id.* at 168.

### B.

■■■■ Conduct that is not conclusively presumed to be illegal under the per se rule must be proved to be unreasonable under the rule of reason test. Rule of reason analysis calls for a "thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition." *Northrop,* at 1050. Cascade argues that material issues of fact remain and that the district court erred in granting summary judgment against it on its section 1 claim under the rule of reason. Because no competitive benefits can be asserted on behalf of a conspiracy to deny a new competitor an advantageous lease, Cascade argues that the competitive evils of the restraint outweigh the competitive benefits and that it was therefore entitled to have the jury rule on its section 1 claim under the rule of reason. We rejected this very argument in *Gough v. Rossmoor Corp.:*

> [T]he fact that no competitive benefits are advanced in favor of a restraint . . . does not automatically constitute it unreasonable under the Sherman Act. As we have already noted, it must first be established to be a restraint on competition and this involves a consideration of the impact of the restraint on the competitive conditions within the field of commerce in which the plaintiff was engaged and upon those commercially engaged in competition with it.

585 F.2d at 389. The balancing process of the rule of reason is not applied to a particular agreement or practice until after the plaintiff has established that the challenged conduct constitutes a restraint on competition. *Id.* To establish a cause of action for an unreasonable restraint of trade in violation of section 1 under the rule of reason, the plaintiff must show the following elements: "(1) an agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition." *Reid Brothers Logging Co. v. Ketchikan Pulp Co.,* 699 F.2d 1292, 1296 (9th Cir.1983).

■■■ Cascade's attempt to establish a rule of reason violation fails for the same reason as its attempt to establish a per se violation: there is no evidence of injury to competition. Although Cascade complains of its business losses, economic injury to a competitor does not equal injury to competition. *See Klamath-Lake,* 701 F.2d at 1292; *Mutual Fund Investors,* 553 F.2d at 627. We have stressed that "[i]t is injury to the market, not to individual firms, that is significant." *Klamath-Lake,* 701 F.2d at 1292. We hold that Cascade has failed to produce sufficient evidence to prevent summary judgment against it on its section 1 claim.

### IV

■■■ Cascade's final argument is that the district court erred in awarding summary judgment against it on its claim for attempted monopolization in violation of section 2 of the Sherman Act. In order to establish a claim for attempted monopolization, a plaintiff must show (1) a specific intent to control prices or destroy competition in the relevant market, (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose, and (3) a dangerous probability of success. *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 543-44 (9th Cir.1983) (*Foremost*); *Janich Brothers, Inc. v. American Distilling Co.,* 570 F.2d 848, 853 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978) (*Janich Brothers*).

Cascade attempts to prove the required specific intent by direct evidence as well as by inference from the challenged conduct. Cascade's direct evidence does not show that Timberland had a specific intent to control prices or destroy competition. Although the facts, viewed most favorably to Cascade, show that Timberland may have been motivated by a desire to prevent a new competitor from leasing its abandoned plant, such an intent falls short of the requisite intent to monopolize. The single act of excluding Cascade from the vacant Kirkland facilities did not prevent Cascade from entering the market.

The conduct element of an attempted monopolization claim is closely related to the other two elements. Certain types of conduct may be relied upon to imply the necessary intent and dangerous probability of success. *Foremost*, 703 F.2d at 544; *Janich Brothers*, 570 F.2d at 853–54. In the absence of direct evidence of specific intent to monopolize, however, the level of proof required to establish the conduct element increases. In this situation, the "plaintiff must introduce evidence of conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or clearly exclusionary." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1030 (9th Cir.1981) (footnote omitted), *cert. denied*, ── U.S. ──, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Our analysis under this standard proceeds generally under the standards developed in Sherman Act section 1 cases.[3] As we have already pointed out, Cascade has failed to establish a substantial claim of restraint of trade. Thus, even if the challenged practice could satisfy the conduct element of attempted monopolization, it cannot supply an inference of the other two elements. Summary judgment was therefore appropriate.

In conclusion, we find no genuine issues of material fact relating to Cascade's antitrust claims under the Sherman Act. The antitrust laws were not intended to reach the type of conduct of which Cascade complains. The Sherman Act was enacted to protect competition in the marketplace. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); *Murphy Tugboat Co. v. Crowley*, 658 F.2d at 1259. It was not designed, and has never been interpreted, to reach all business practices, unfair or otherwise, damaging to individual companies. The district court correctly granted the defendants' motion for summary judgment.

AFFIRMED.

---

3. We depart from the standards under section 1 to the extent necessary to evaluate the conduct of a single firm that would escape liability under section 1 because of that section's limitation to concerted or contractual activity. When, as here, the plaintiff challenges concerted activity, and we hold that the conduct does not amount to a substantial claim of restraint of trade under section 1, our holding precludes us from finding that the conduct is the type of conduct necessary to support an inference of the other two elements of an attempted monopolization claim under section 2. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir.1983); *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 736 (9th Cir.1979); *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 853–54 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).