653 F.2d 1302
 1981-2 Trade Cases 64,238
 A. H. COX & COMPANY, a corporation, Plaintiff-Appellant,
v.
STAR MACHINERY COMPANY, a corporation; Star Rentals, Inc., a
corporation; and R. O. Products, Inc., a
corporation, Defendants-Appellees.
 No. 78-3574.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 10, 1980.
Decided Aug. 17, 1981.
 
 Frederic C. Tausend, Schweppe, Doolittle, Krug, Tausend & Beezer, Seattle, Wash., for plaintiff-appellant.
 Bill Helsell, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before TRASK and KENNEDY, Circuit Judges, and TASHIMA,* District judge.
 KENNEDY, Circuit Judge:
 
 
 1
 In this antitrust action, one distributor wrested a product line away from a second distributor, its principal competitor. The injured firm sued both the distributor who took the line and the manufacturer-supplier, alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976). The complaint charged an attempt to monopolize the relevant market and a concerted refusal to deal. After reviewing allegations of the plaintiff in response to a summary judgment motion by the defense, the district court found that plaintiff had offered no evidence from which an unlawful intent could be established and, accordingly, it granted the defendant's motion for summary judgment on both counts. We affirm.
 
 
 2
 A. H. Cox & Co. (Cox) was an independent distributor of heavy equipment, including truck mounted hydraulic cranes with capacities ranging from 4 to 10 tons.[1] Truck mounted cranes of this type are used extensively in the construction industry to set pipelines, position trusses on buildings, and move equipment and materials at yards and job sites. Cox's primary competitor, both for the sale of truck mounted hydraulic cranes and the sale of other heavy equipment generally, was Star Machinery Co., including its wholly owned subsidiary, Star Rentals, Inc., both referred to here as "Star."
 
 
 3
 During 1974, the relevant period in this action, four domestic manufacturers accounted for 95 percent of all small truck mounted cranes manufactured and sold nationwide. These manufacturers were R. O. Products, Inc. (R. O.), Pitman Manufacturing Co. (Pitman), National Crane Co., and Scott Midland. The market at issue here is the retail distribution of these small truck mounted cranes in a three county area of western Washington that roughly comprises metropolitan Seattle. Within this market, all four major manufacturers of truck cranes were represented, each by a distributor which carried one line exclusively. The two principal manufacturers' lines involved in this action were R. O. and Pitman, distributed by Cox and Star respectively. Star's retail sales of the Pitman crane accounted for approximately 50 percent of the market. Cox, its closest competitor, had sales comprising 20 to 25 percent of the market. Two other dealers and their respective products took up most of the balance. The crux of the dispute is that Star succeeded in persuading R. O. to let Star carry its line instead of Cox. Pitman was then assigned from Star to a Seattle distributor called Fray Equipment Co. (Fray), and Cox was left without any line.
 
 
 4
 Cox claims Star knew Cox had financial difficulty and was dependent on the R. O. line, and that Star took the R. O. line in order to eliminate Cox as a competitor. Cox further asserts that Star secured the R. O. line by unfair methods of competition, in that it elicited confidential financial data about Cox from former Cox employees and then distorted and misrepresented the gravity of Cox's financial predicament to R. O. It is alleged that loss of the R. O. line created severe cash flow problems for Cox. Two and a half years after losing the line, Cox declared bankruptcy.
 
 
 5
 In the complaint below, Cox alleged that Star attempted to monopolize the retail sale by distributors of small truck mounted cranes in violation of section 2 of the Sherman Act, and that Star and R. O. conspired to refuse to deal in violation of section 1 of the Sherman Act.[2] The complaint further asserted pendent state claims based on alleged state antitrust violations and on torts of commercial misconduct. The district court found that Cox failed to show any triable issue of fact or proof in support of its claims that Star acted with an unlawful intent to restrain competition and attempted to gain a monopoly, control prices, and exclude competition. The court entered summary judgment against Cox on its antitrust claims and dismissed the pendent state claims without prejudice. Cox appeals from the summary judgment.
 
 
 6
 In reviewing the grant of summary judgment, we of course must view the evidence and all permitted inferences in favor of Cox, and uphold the lower court's dismissal only if Star has met its burden of proving the absence of any genuine issues of material fact. Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 668 (9th Cir. 1980); Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620, 624 (9th Cir. 1977). We must recognize further that summary judgments are disfavored in antitrust cases, especially when motive or intent is at issue. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Sierra Wine & Liquor Co. v. Heublein, Inc., 626 F.2d 129, 132 (9th Cir. 1980). We nevertheless agree with the district court that summary judgment should be granted in this case.
 
 
 7
 Cox contends that Star's agreement with R. O. prior to Cox's termination constituted an unreasonable restraint of trade in violation of section 1 of the Sherman Act. Cox argues that whether this combination is deemed per se unreasonable, or simply judged under the rule of reason, this concerted refusal to deal should be held unlawful.
 
 
 8
 At the outset, we note that there are four categories of competitive restraints which have been held unreasonable per se: (1) horizontal and vertical price fixing; (2) horizontal market division; (3) group boycotts and concerted refusals to deal; and (4) tie-in sales. Gough v. Rossmoor Corp., 585 F.2d 381, 386 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). While a theory of the complaint is that Star and R. O. conspired to refuse to deal with Cox, the law appears settled that a per se violation will result only where "there has been some horizontal concert of action taken against victims of the restraint."[3] Id. at 387. Mutual Fund Investors, Inc. v. Putnam Management Co., supra, 553 F.2d at 626-27; see Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Since there is no horizontal impact in this case,[4] the agreement between Star and R. O. must be judged under the rule of reason.[5]
 
 
 9
 To prove the restraint of trade unreasonable, Cox must show the refusal to deal was intended to, or actually did, restrain trade. Marquis v. Chrysler Corp., 577 F.2d 624, 639-40 (9th Cir. 1978); Knutson v. Daily Review, Inc., 548 F.2d 795, 803 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). We assume for purposes of testing Cox's case that Cox can prove its business failure was a direct and foreseeable result of Star's actions. That Star foresaw the result, however, does not in this case constitute the unlawful purpose proscribed by the antitrust laws. It is well established that exclusive distribution arrangements, while restraints in one sense, nevertheless serve to promote interbrand competition. See, e. g., Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 38-39, 51-59, 97 S.Ct. 2549, 2551, 2558-2562, 53 L.Ed.2d 568 (1977); Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418, 420 (D.C.Cir.), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). Manufacturers therefore may grant exclusive dealerships, and even cut off an existing dealer in order to do so, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), provided there is no overriding purpose to eliminate competition in the relevant market. Mutual Fund Investors, Inc. v. Putnam Management Co., supra, 553 F.2d at 626; Bushie v. Stenocord Corp., 460 F.2d 116, 119-20 (9th Cir. 1972). Competition is promoted when manufacturers are given wide latitude in establishing their method of distribution and in choosing particular distributors. Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376 (9th Cir. 1981). Judicial deference to the manufacturer's business judgment is grounded in large part on the assumption that the manufacturer's interest in minimum distribution costs will benefit the consumer. Continental T.V., Inc. v. GTE Sylvania, Inc., supra, 433 U.S. at 54-56, 97 S.Ct. at 2559-2560; Note, Vertical Agreements to Terminate Competing Distributors: Oreck Corp. v. Whirlpool Corp., 92 Harv.L.Rev. 1160, 1164 (1979). A contrary rule would foster rigidity in distribution arrangements, a result antithetical to a market dependent on vigorous competitive forces. Cartrade, Inc. v. Ford Dealers Advertising Ass'n, 446 F.2d 289, 294 (9th Cir. 1971).
 
 
 10
 Most cases recognizing the right to establish an exclusive manufacturer-dealer relation arise when an arrangement is formed or changed at the behest of the manufacturer. See, e. g., Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245, 1247 (5th Cir. 1975); Bushie v. Stenocord Corp., supra, 460 F.2d at 118. As a general rule, such arrangements have been viewed as vertical in nature, thus rendering the per se rule of illegality inapplicable. Gough v. Rossmoor Corp., supra, 585 F.2d at 387; Mutual Fund Investors, Inc. v. Putnam Management Co., supra, 553 F.2d at 626-27. See Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). In the case before us, the change was requested by the distributor. It is argued that the thrust of the transaction thus becomes horizontal, with an anticompetitive animus directed to a co-distributor. We do not agree. The right to suggest or initiate dealership changes does not reside exclusively in the manufacturer. Mutual Fund Investors, Inc. v. Putnam Management Co., supra, 553 F.2d at 626; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra, 416 F.2d at 78. A contrary rule would give manufacturers more control over dealers than is consistent with the interests of free competition at the distributor level. It is widely recognized, moreover, that in most circumstances dealer terminations or substitutions do not adversely affect competition in the market. See, e. g., Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); H & B Equipment Co. v. International Harvester Co., 577 F.2d 239 (5th Cir. 1978); Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972); Scanlon v. Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir. 1968); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). The economic impact resulting from a change in distributors is not altered merely because the dealer initiated contact or actively sought the change, provided the manufacturer ultimately makes the decision based on its independent business judgment. Appellant has advanced no evidence of dealer coercion here, and therefore the attempt to cast this arrangement in horizontal terms must fail.
 
 
 11
 Under the foregoing principles, appellant cannot prevail because it has failed to adduce any evidence of anticompetitive effect or intent which would distinguish this dealer substitution case from the myriad of decisions upholding changes in distributors. That one distributor will be hurt when another succeeds in taking its line will be axiomatic in some markets, as it was here, but the intent to cause that result is not itself prohibited by the antitrust laws. The intent proscribed by the antitrust laws lies in the purpose to harm competition in the relevant market, not to harm a particular competitor. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Star continued to carry only one line of products, its former line having been assigned to another distributor.[6] Where each distributor has only one line, it is particularly appropriate to recognize the right of a distributor to initiate changes; otherwise, a weak distributor could continue ineffective promotion of a good brand, while a strong distributor could be forced to continue representing a manufacturer with whom it has poor relations. A distributor is not required to lose its product before commencing the quest for a manufacturer with whom it can have a more advantageous relation.
 
 
 12
 These observations apply to the market in this case. Star and Pitman did not have a good business relation, as evidenced by the disruption of its dealership in a separate market (Portland, Oregon), and Cox introduced no evidence to rebut that. Cox, on the other hand, carried a good product but was financially weak. Cox offered no evidence to show that competition in the market was disserved when Star took over a product line that had less sales than the one it abandoned. There was, moreover, no showing of any barriers to entry in this market by new distributors, apart from the limited number of lines available. It is undisputed that there was immediate entry into the market by a new distributor, which continued representation of the product line formerly carried by Star.
 
 
 13
 Cox argues that this substitution of a distributor with a smaller market share than Cox has an anticompetitive effect. Cox's theory in this regard holds that, because the design and performance of the four makes of cranes were similar, demand for them was solely a function of the servicing abilities of the dealers selling them. It is argued therefore that the termination of Cox and replacement with a distributor less adept at servicing harms competition. Evidence in the record reveals, however, that other factors apart from servicing abilities, including availability of dealer financing and brand name familiarity, contribute to the demand for cranes. In support of its theory, moreover, Cox has shown only that the new distributor, Fray, did not advertise in the yellow pages and was located outside the central business core. That is insufficient to demonstrate that the new distributor was unable to compete or that Star's efforts were designed to alter the competitive structure of the market.
 
 
 14
 There was uncontradicted testimony, on the other hand, from the sales executives of the manufacturers and other distributors to the effect that competition in the market remained vigorous. This was in no way rebutted by Cox. Cox made no credible showing that it was likely or even possible that, after Star gave up a product accounting for 50 percent of the market in exchange for one accounting for only 25 percent, Star's market share was significantly increased. For these reasons, we agree with the lower court that Cox failed to demonstrate any anticompetitive intent or effect arising from Star's actions.
 
 
 15
 Similarly, allegations of unfair competition by the new dealer are insufficient to raise antitrust concerns in this case. No adverse effect on competition is cited, nor suggestions that the manufacturer's business judgment was demonstrably affected. Such charges might merit scrutiny under state tort law, but without proof of anticompetitive effect they are not actionable under section 1 of the Sherman Act.[7] George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); see Gough v. Rossmoor Corp., supra, 585 F.2d at 386.
 
 
 16
 Cox further alleges that Star violated section 2 of the Sherman Act by attempting to monopolize the market for the retail distribution of small truck mounted cranes in western Washington. To prove an attempt to monopolize claim, Cox must, at a minimum, advance some evidence demonstrating (1) a specific intent to control prices or exclude competition and (2) predatory conduct directed to the accomplishment of that unlawful purpose. Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 924-26 (9th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); Blair Foods, Inc., supra, 610 F.2d at 669; Greyhound Computer Corp. v. International Business Machines Corp., 559 F.2d 488 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). Specific intent to monopolize may, and normally will, be inferred from anticompetitive conduct. Hunt-Wesson Foods, Inc., supra, 627 F.2d at 926; Gough v. Rossmoor Corp., supra, 585 F.2d at 390.
 
 
 17
 While intent and conduct are essential elements to be proved in a prima facie case, a third element, though not indispensable, is a dangerous probability of success in monopolization. In most cases a dangerous probability of success will be inferred from predatory conduct and specific intent to control prices or exclude competition. Janich Brothers Inc. v. American Distilling Co., 570 F.2d 848, 853 (9th Cir. 1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); Lessig v. Tidewater Oil Co., 327 F.2d 459, 474-75 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Nevertheless, proof of market power can be relevant in drawing the inference of specific intent where the conduct at issue is potentially anticompetitive or ambiguous. If the conduct clearly threatens competition, however, the inference will be drawn irrespective of the defendant's market power. Hunt-Wesson Foods, Inc., supra, 627 F.2d 925-26; Blair Foods Inc., supra, 610 F.2d at 669-70.
 
 
 18
 Specific intent to monopolize will not be inferred in this case, nor is proof of market share a relevant factor, for Star's conduct was not anticompetitive or even ambiguous. Star's actions in initiating a dealership change did not adversely affect competition, but rather was protected under the rule that a business entity may choose to deal with whomever it wishes. Hawaiian Oke, supra. It follows essentially from what we have said above that Cox has not set out the elements of an attempt to create a monopoly. Accordingly, the summary judgment is AFFIRMED.
 
 TASHIMA, District Judge, dissenting:
 
 19
 I respectfully dissent.
 
 
 20
 I have no dispute with most of the majority's statement of applicable law. However, on the basis of the record before the district court, I believe that appellant A. H. Cox & Company ("Cox") had viable and triable claims under both § 1 and § 2 of the Sherman Act. While paying lip service to the law governing summary judgment in antitrust cases, the majority draws every inference against Cox (the resisting party) and misconstrues the relevant market. If, as required, the reasonable inferences arising from the uncontroverted facts are drawn in favor of Cox and if the relevant market is properly defined, summary judgment was improperly granted. I would, therefore, reverse the district court's grant of summary judgment, and remand this case for trial.
 
 
 21
 In general, as the majority recognizes, a party moving for summary judgment must prove the absence of any genuine issue of material fact. Fed.R.Civ.P. 56(c); First National Bank v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968) (summary judgment appropriate only in absence of "any significant probative evidence tending to support the complaint"); Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376, 1381 (9th Cir. 1981), petition for cert. filed, 49 U.S.L.W. 3955 (No. 80-2080, June 1, 1981). As the Supreme Court has emphatically stated, summary judgment is rarely appropriate in antitrust litigation, especially when the defendants' motive and intent are in question. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473-74, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); see Sierra Wine & Liquor Co. v. Heublein, Inc., 626 F.2d 129, 132 (9th Cir. 1980); Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1970). Moreover, every possible factual inference must be drawn in favor of the party opposing a motion for summary judgment. Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 668 (9th Cir. 1980).
 
 
 22
 With respect to appellant's claim that R. O. Products, Inc. ("R. O.") and Star Machinery Company ("Star") conspired to restrain trade in violation of § 1 of the Sherman Act, Cox may well have been able to establish that appellees intended to restrain trade and were successful in their efforts.[1] Knutson v. Daily Review, Inc., 548 F.2d 795, 803 (9th Cir. 1976), cert. denied, 443 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). Although not otherwise contended by Cox at this stage, I agree with the majority that the decision to terminate Cox as a distributor was not a horizontal restraint of trade and, therefore, not a per se violation of the antitrust laws.[2] Gough v. Rossmoor Corp., 585 F.2d 381 (9th Cir. 1978). It is also true that prior decisions of this Court have given manufacturers wide latitude in establishing their methods of distribution. Manufacturers have been permitted to grant exclusive dealerships, and to change dealers almost at will, regardless of whether there is good cause for the change. Maj.op. at 1305, 1306; Bushie v. Stenocord Corp., 460 F.2d 116, 119-20 (9th Cir. 1972); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). In this case, however, there is evidence that R. O.'s decision to terminate Cox as a distributor was not reached through an exercise of the independent business judgment of R. O., as the majority implies. See Cernuto Inc. v. United Cabinet Corp., supra, 595 F.2d at 170. Rather, as the majority recognizes, it must be presumed that Star misinformed R. O. as to Cox's financial condition, that the decision to terminate was based on this misinformation, and that both Star and R. O. could have foreseen that the change in distributorships would lead to Cox's demise, see Maj.op. at 1306, and that it would be difficult for Cox to obtain an alternate source of supply. Cf. Mutual Fund Investors Inc. v. Putnam Management Co., 553 F.2d 620, 627 (9th Cir. 1977) (refusing to find an unreasonable restraint of trade, on the ground that a wide variety of alternative sources of supply were available).
 
 
 23
 There is adequate evidence in the record to support a finding that Cox was not, in fact, in financial difficulty at the time of Star's alleged statements to the contrary,[3] i. e., Cox's financial condition is not an uncontroverted fact. If it were shown at trial that Star deliberately tried to undermine Cox by misleading R. O., that fact would be sufficient to take this case out of the general rule of Seagram and its progeny. An otherwise permissible dealership termination may violate the antitrust laws if it is effectuated through predatory practices. Coleman Motor Corp. v. Chrysler Corp., 525 F.2d 1338, 1347 (3d Cir. 1975); cf. Bushie, supra, 460 F.2d at 119-20 ("sinister anticompetitive intent" could not necessarily be inferred from the cancellation of a dealership). Even if Star had a legitimate business reason for wanting to take over the R. O. distributorship, and even if R. O. had a legitimate reason for wanting to satisfy Star's desire, their action would not be immunized from the antitrust laws if it were also motivated by an intent to drive Cox out of business. Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc., 539 F.2d 907, 913 (2d Cir. 1976). As this Court recently stated:
 
 
 24
 " 'Although a company may ordinarily deal or refuse to deal with whomever it pleases without fear of violating the antitrust laws, refusal to deal which is anticompetitive in purpose or effect, or both, constitutes an unreasonable restraint of trade in violation of the Sherman Act,' even when justified by a legitimate business reason. Whether a defendant refused to deal and, if so, whether the refusal was a product of an anticompetitive motive are factual issues that should not be taken from the jury 'unless "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." ' "
 
 
 25
 Program Engineering, Inc. v. Triangle Publications, Inc., 634 F.2d 1188, 1195 (9th Cir. 1980), citing Fount-Wip, Inc. v. Reddi-Wip, Inc., 568 F.2d 1296, 1300 (9th Cir. 1978) (reversing grant of summary judgment and remanding for trial). The fact that Star dominated the market even before the distributorship change requires us to give appellant's claims particularly careful scrutiny. Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 32 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).
 
 
 26
 The key step in determining whether Star's actions might have been unreasonable is to decide whether, given the chance, Cox might have proven that those actions had a significant effect on competition or that they significantly enhanced Star's market power.[4] Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 558 (7th Cir. 1980); Mutual Fund, supra, 553 F.2d at 627; George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra, 508 F.2d at 562. This is the step over which both the district court and the majority tripped.
 
 
 27
 It is undisputed that before the events in controversy, Star's share of the market for small truck-mounted cranes in the Seattle area was in excess of 50%, and that Cox, with a 25% share, was its principal competitor. There is also evidence that only four companies manufactured such cranes, and that their products were substantially interchangeable. The record supports the inference that each distributor's market share was to a large degree determined by factors within the control of the distributor, other than the brand name of its cranes, such as price, advertising and the quality of service provided. This inference is also supported by the fact that the manufacturers' respective shares of the national market bore no resemblance to the shares of market held in the greater Seattle metropolitan market by their respective distributors. In deciding Star's summary judgment motion, the district court should have drawn this inference in appellant's favor and analyzed the relevant market at the distributor level rather than at the manufacturer level.
 
 
 28
 Applying this analysis of the market makes the potential anticompetitive effect of Cox's demise appear much greater than the trial court was willing to acknowledge. The court's assumption, adopted by the majority, was that the market share of each manufacturer would remain relatively constant, regardless of any changes at the distributor level. The court, therefore, assumed that when Star abandoned the manufacturer it had previously represented (Pitman) and took over the line that had been represented by Cox (R. O.), Star's market share would decline from 50 percent to 25 percent, the market share formerly held by Cox. Nothing in the record supports this inference. A much more reasonable inference is that, in light of its strength as a distributor, Star would at least retain its 50 percent market share regardless of which line of cranes it sold. The court also assumed that Fray, the distributor which took over the Pitman line, would immediately accede to a significant market share and would replace Cox as an equally vigorous competitor of Star. This inference also is unsupported by the record. If market share is essentially a function of distributor strength, it is at least as likely that Cox's former customers were split among its competitors.
 
 
 29
 Thus, if all reasonable inferences from the record, including the absence of certain facts, are drawn in Cox's favor as required, Blair Foods, Inc., supra, 610 F.2d at 668, the following inferences may reasonably be drawn: (1) market share in the relevant market is determined at least in significant part by the strength of the distributor, based on factors other than the brand name of its crane line; (2) since nothing in the record demonstrates that Star's switching of brands weakened it as a distributor at all, Star at least retained its 50-75 percent share of market; (3) since there is nothing in the record as to Fray's share of market it is unreasonable to infer that it was able, as a new entrant with no identification or goodwill, to immediately capture any significant market share; and (4) the elimination of its primary competitor, Cox, and the entry of a new, unknown competitor, Fray, enabled Star to substantially increase its market share in an oligopolistic market. Accepting these inferences as true, as we must on summary judgment, Cox's demise may be found to have enhanced Star's dominance of the market, and adversely affected competition in the market as a whole. See Mutual Fund, supra, 533 F.2d at 627; Knutson, supra, 548 F.2d at 803.
 
 
 30
 I recognize that the foregoing analysis of anticompetitive effect involves some theorizing on my part, in that the trial court was offered no evidence of what each company's market share became after Cox's demise and the entry of Fray. However, appellant adduced the basic facts and a reasonable theory to support its assertion of anticompetitive effect. See Ron Tonkin, supra, 637 F.2d at 1381; Bushie, supra, 460 F.2d at 116. Moreover, the burden of proving that there are no genuine issues of material fact falls on the moving party (in this case, the appellees). Blair Foods, supra, 610 F.2d at 668. Since the effect on competition of Cox's exclusion from the Seattle small crane market is a material issue of fact, the district court's grant of summary judgment was improvident, and should be reversed. See Poller, supra, 368 U.S. 472-73, 82 S.Ct. at 490-91.
 
 
 31
 Finally, in light of the foregoing, I would also reverse the district court's summary judgment with respect to appellant's claim under § 2 of the Sherman Act. The district court held that since appellant had not shown any anticompetitive conduct on the part of Star, it would be unable to prove that Star had attempted to monopolize the small crane market.[5]
 
 
 32
 The majority's affirmance of summary judgment against Cox on its § 2 claim is bottomed on its conclusion that "Star's actions in initiating a dealership change did not adversely affect competition ...." Maj.op. at 1309. As I have attempted to explain in connection with Cox's § 1 claim, such a conclusion can be justified only if the reasonable inferences from the facts in the record are drawn in favor of Star, the moving party. What is involved here is a classic oligopolistic market in which four firms control 95 percent of the market and the top two firms control 70-75 percent. In such a market, in my view, no other inference can reasonably be justified in a summary judgment context, absent other compelling evidence as is the case here, than that elimination by the leading firm with a 50 percent share of its primary competitor with a 20-25 percent share from the market is anticompetitive. See Greyhound Computer Corp., Inc. v. International Business Machines Corp., 559 F.2d 488 (9th Cir. 1977). The fact that another firm entered the market does not change the result, absent a showing, which has not been made here, of what that firm's market share was.
 
 
 33
 Since I conclude that the effect on competition of Cox's exclusion from the market is a controverted issue of fact and that Cox may be able to show anticompetitive impact at trial, it was error to grant summary judgment against Cox on its § 2 claim.
 
 
 34
 I would reverse the judgment and remand the case for trial.
 
 
 
 *
 Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 In July of 1977, Cox declared bankruptcy and since then its trustee in bankruptcy, Carsten Johnsen, has maintained the action
 
 
 [2]
 R. O. settled out of the case but is still a named defendant for purposes of the conspiracy charge
 
 
 [3]
 This court recently has stated that vertical agreements to exclude competition may in some instances require application of the per se rule. Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376, at 1384-86. The court reasoned that characterization of the restraint as vertical or horizontal should not end the inquiry; rather, the relevant focus should be directed towards the economic impact of the restraint. It is true that where interbrand competition, as opposed to intrabrand competition, is adversely affected, significant antitrust concerns may be implicated. Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Thus, a per se violation might be established if a manufacturer's decision to terminate a dealer was prompted by dealer coercion, either by a single dealer or by a group of dealers. See Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979). There is no such proof of coercion offered by Cox
 
 
 [4]
 Fray Equipment Co. was not a named defendant
 
 
 [5]
 We decline to establish a fifth per se category, as urged by Cox, to cover vertical combinations that eliminate a competitor. The Supreme Court recently has indicated in Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 58-59, 97 S.Ct. 2549, 2561-2562, 53 L.Ed.2d 568 (1977), that vertical, nonprice market restrictions should be decided under the rule of reason. See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975)
 
 
 [6]
 Cox does not allege a horizontal conspiracy between Star and Fray, the distributor assigned the Pitman line. Nor does Cox claim it attempted to secure the Pitman line, but failed due to Star's actions
 
 
 [7]
 Cox contends the Pick-Barth rule of according per se treatment to unfair competitive practices designed to eliminate a competitor should be adopted here. Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir.), cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). We do not agree. The First Circuit has limited the Pick-Barth rule substantially, and most courts decline to apply it. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). See Northwest Power Products, Inc. v. Omark Industries, Inc., 576 F.2d 83 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); Note, Antitrust Treatment of Competitive Torts: An Argument for a Rule of Per Se Legality Under the Sherman Act, 58 Tex.L.Rev. 415 (1980)
 
 
 [1]
 To avoid summary judgment, a plaintiff alleging a § 1 conspiracy must come forward with specific facts to show that there was an agreement between two or more distinct persons or entities. Blair Foods, supra, 610 F.2d at 671. This burden may be met by producing circumstantial evidence of an agreement. Id. The judgment below simply assumed that Cox would be able to prove the existence of an agreement at trial, but does not explain whether it did so because there was enough evidence to support the possibility that an agreement was made, or whether the court did not believe it necessary to reach that question. In either case, I conclude that there was sufficient evidence before the district court to require a denial of summary judgment on this point. There is little question that Star and R. O. personnel discussed the Cox situation. While Star may have had a legitimate reason for doing so (Star was already an R. O. distributor in another state), a jury could have found that appellees' action was outside the bounds of their normal business relationship. Cf. Blair Foods, supra, at 672 (appellees held to have given a justifiable explanation for denying credit to appellant). This inference, unlike the others discussed infra was thus correctly drawn in appellant's favor
 
 
 [2]
 The majority recognizes that even vertical agreements to exclude competition may sometimes require application of the per se rule. An example is when a manufacturer's decision to terminate a dealer is prompted by coercion from other dealers. See Cernuto Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979); Majority opinion ("Maj.op."), at 1305 n.3. While Cox has not alleged that Star coerced its distributor, R. O., it has alleged that Star materially misinformed R. O. with respect to Cox's financial condition, that Star received confidential information about Cox from an ex-employee of Cox and that Star attempted to hire away some of Cox's employees
 The majority takes a dim view of the proposition that unfair competitive practices designed to eliminate a competitor should be treated as a per se violation of the Sherman Act. See Maj.op. at 1308 n.7, citing George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). However, in Paddock Pool, the First Circuit distinguished one of its own earlier cases, Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96, cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), and two subsequent cases from other courts, Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966) and C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F.Supp. 501 (E.D.Pa.1973). This case bears a much closer resemblance to the facts of the three cases distinguished in Paddock Pool than to Paddock Pool itself, inasmuch as Star's actions were clearly directed against Cox and were not simply an effort to win over Cox's customers. Cf. Paddock Pool, supra, 508 F.2d at 560-562 (appellee's conduct was an attempt to win customers rather than damage the organization of appellant).
 Nevertheless, the majority was correct in refusing to characterize Star's alleged conduct as a per se violation. Several circuits have recently rejected the Pick-Barth doctrine entirely. See, e. g., Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 555-56 (7th Cir. 1980); Stifel, Nicolaus & Co., Inc. v. Dain Kalman & Quail, Inc., 578 F.2d 1256 (8th Cir. 1978); Northwest Power Products, Inc. v. Omark Industries, 576 F.2d 83, 88 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). It is worth noting, however, that each of these also held that allegations of unfair competition may be within the scope of the antitrust laws when the Rule of Reason test is applied. See, e. g., Havoco, supra, at 626 F.2d 556.
 
 
 [3]
 Cox received a $300,000 infusion of new capital shortly before its distributorship was terminated
 
 
 [4]
 Under the test used in this Circuit, the unreasonableness of a particular agreement may be established by showing either that the parties intended to restrain trade or that they succeeded in doing so. Knutson, supra, 548 F.2d at 803. In practical terms, however, it is difficult to prove unreasonable intent without proving some effect on competition. See Borger v. Yamaha International Corp., 625 F.2d 390, 397 n.4 (2d Cir. 1980)
 
 
 [5]
 In order to be held liable under § 2, a defendant must be demonstrated to have (1) specifically intended to control prices or exclude competition, and (2) engaged in predatory conduct directed to the accomplishment of that unlawful purpose. Maj.op. at 1308; Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 924-26 (9th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). However, specific intent to monopolize is generally inferred from anticompetitive conduct. Id. While the courts have sometimes also required a showing of dangerous probability of monopolization, see e. g., Cornwell Quality Tools Co. v. C.T.S. Co., 446 F.2d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972), that requirement, as demonstrated, infra, was also met in this case