**COMPUTER PLACE, INC., a California corporation, Plaintiff,**

**v.**

**HEWLETT–PACKARD COMPANY, a Corporation;  and  Computerland, Inc., a Corporation, Defendants.**

**No.  C–82–4176  WHO.**

United States District Court, N.D. California.

Oct. 22, 1984.

**2.**  The Court has considered Hustler's remaining arguments on post-trial motions and finds them to be without merit.

Shayle P. Fox, Fox & Grove, Chartered, Chicago, Ill., for plaintiff.

J. Thomas Rosch, Robert L. Ebe, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for Hewlett-Packard.

Timothy E. Carr, San Francisco, Cal., Michael J. Walter, Hayward, Cal., for Computerland.

## MEMORANDUM AND ORDER

ORRICK, District Judge.

Plaintiff, Computer Place, Inc. ("CPI"), has sold personal computers, calculators, and computer accessories by mail order and through a retail store in Carmel, California, since 1979. Defendant Hewlett-Packard ("HP") manufactures, sells, and distributes to dealers a wide range of computers, computer accessories, calculators, supplies, and parts for those machines. Defendant Computerland, Inc. ("CL") is a franchisor whose franchisees operate retail stores that sell those items to the public.

On June 3, 1982, HP announced a change in marketing strategy that significantly impacted its mail-order retailers. HP stated to all dealers that it had developed a program that emphasized face-to-face selling and local dealer support, as opposed to mail-order selling. The new program contained incentives to stimulate local dealer retailing. It also included a provision denying mail-order sellers the new personal computer models it developed. CPI alleges various federal antitrust and state law violations based on this change in distribution policy and the contract negotiations HP and CL were conducting at the same time.

Specifically, CPI alleges that defendants and various unidentified parties conspired to engage in acts that unreasonably restrained trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and conspired or attempted to monopolize the "business and scientific computer" market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. HP is also alleged to have violated § 2(a) of the Clayton Act, 15 U.S.C. § 13(a), by agreeing to sell products to CL at a lower price than it sold products to CPI. In addition, CPI alleges pendent state law claims, including breach of an oral promise by HP under a theory of promissory or equitable estoppel, tortious interference by HP with CPI's business relationship with its clients, and tortious interference by CL with CPI's contractual relationship with HP.

Defendants have moved for summary judgment on all claims. For the reasons herein stated, the motion is granted.

### I. *Sherman Act §§ 1 and 2*

The Court will deal with the Sherman Act claims, the Robinson-Patman Act claims, and the pendent state claims in that order, but first it is appropriate to comment briefly on the application of the drastic method of summary judgment to the facts as they have been presented to the Court by numerous exhibits, depositions, affidavits, declarations, and the like, and interpreted by voluminous briefs and memoranda as well as by excellent oral argu-

ment. It is but a truism to note that the roads to and from appellate courts are strewn with the wreck of complex antitrust cases. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). But this does not mean that *Poller* and its progeny has read Federal Rule of Civil Procedure 56 out of the law and in particular cases where, under appropriate circumstances, it is proper to apply summary judgment. This is such a case where the pleadings and evidence present no genuine material issue of fact. The evidence must be viewed in a light most favorable to the party opposing summary judgment. But this party must also produce "significant probative evidence tending to support the complaint" that is relevant to the disputed factual issues and truly material to the litigation. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). "A lawfully displaced competitor cannot construct a justiciable controversy from artful pleading alone." *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 971 (9th Cir.1983).

### A. *Sherman Act § 1: Conspiracy.*

■ Section One of the Sherman Act proscribes concerted conduct rather than independent action. *Monsanto v. Spray-Rite Service Corp.*, — U.S. —, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).[1] The plaintiff must allege "sufficient facts to raise a reasonable inference of an illegal combination or conspiracy." *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1261 (9th Cir.1983), *cert. dismissed*, — U.S. —, 104 S.Ct. 385, 78 L.Ed.2d 331 (1984). CPI has alleged a price-fixing scheme by defendants. It may not infer an agreement from highly ambiguous evidence to support this allegation. Rather, it must produce evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. *Monsanto, supra*, 104 S.Ct. at 1471.

The relative burdens to be carried on a summary judgment motion are stated in *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 55 (9th Cir.1975):

"Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper."

### 1. *Evidence of Independent Action.*

CPI alleges that HP, CL, and their co-conspirators engaged in a price-fixing scheme which included eliminating CPI as a mail order-seller because it offered price discounts to purchasers of HP products. Complaint at ¶ 13. HP allegedly initiated this conduct in response to complaints from CL and other co-conspirators. Complaint at ¶ 14.

To rebut these allegations, HP asserts its actions were unilateral, and taken to further a general marketing strategy initiated in November 1981. The strategy deemphasized mail order distribution in favor of local dealers who could provide full service support for unsophisticated buyers of a new generation of personal computers.

In support of this assertion, HP submits evidence and testimony. The new HP–125 personal computer, introduced in the fall of 1981, was designed for neophyte users, such as businessmen and professionals; whereas the HP–85, sold by CPI and other mail-order dealers had been targeted for engineers and scientists. Stihler Depo. at 153–155; Rogers Decl. at ¶ 10. By November 12, 1981, HP's Marketing Council had developed "Distribution Objectives" that sought to emphasize dealers, such as computer stores and major retail chains, who would sell and support the full product line. Ebe Decl., Exhs. 12 & 13.

---

**1.** The *Monsanto* court reaffirmed earlier: "A manufacturer of course has the right to deal or refuse to deal with whomever it likes, as long as it does so independently." *Monsanto v. Spray-*

*Rite Service Corp.*, — U.S. —, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, *citing United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

HP's competitors were also changing their distribution strategies. A November 2, 1981, letter from Apple Computer, Inc. to CPI states that Apple would no longer supply mail-order dealers because such sellers do not educate or support the consumer. Ebe Decl., Exh. 14. On November 4, 1981, CPI agreed to a modification of its Apple Dealer Sales Agreement prohibiting CPI from making mail order or telephone sales of Apple products because "customers purchasing [Apple products] can be properly served only if they have the benefit of pre- and post-sale education, orientation and support." *Id.* The modification emphasized that each customer's needs must be properly assessed and the features, operation and application of Apple products must be demonstrated and fully explained because of their "technical nature." *Id.* David Stihler, President of CPI, also acknowledged that Osborne and Sony discouraged mail order sales of personal computers. Stihler Depo. at 752, 768. In February and March of 1982, independent market data confirmed that mail-order computer sales would not be viable in the future. Ebe Decl. Exhs. 21 and 22.

HP asserts it was concerned about "free-riding" by mail order dealers on the sales efforts of local dealers. Mail order dealers used advertising allowances to finance national campaigns designed to attract customers who had been "presold" by a local dealer, and who would buy through mail-order dealers to get a lower price. Rogers Decl. at ¶¶ 17–21. Volume discounts offered by HP exacerbated this problem. Local dealers rarely were able to purchase in the quantity required to qualify for these discounts; whereas mail-order dealers in-

variably could.[2] These programs made HP promotion very unattractive to local dealers, precisely the type of distributors HP wanted to attract. Both the rate at which HP was acquiring new dealers and its sales were down in the face of an overall market upswing. Rogers Decl. at ¶ 24.

In the Fall of 1981, HP began a thorough evaluation of its marketing strategy. The results of a November 1981 dealer survey were presented to the Marketing Council in December 1981. These results confirmed local dealer dissatisfaction with HP's mail-order favoritism and prompted the Council to gather additional data. In March 1982, after confirming market trends and the adverse effect of policies favoring mail-order dealers,[3] the Council appointed a Task Force to evaluate solutions. In May 1982 the Task Force recommended a "Five Point Program." This proposal advocated elimination of advertising allowances and volume discounts, both of which favored mail-order dealers. HP also decided to exercise its contractual right and distribute *new* computer models only through dealers who would provide face-to-face end user support.[4] Dealers were notified of these changes in distribution strategy in the June 3, 1982, letter.

■ This evidence is sufficient to rebut the allegations of conspiracy in the complaint. It supports the conclusion that the decision to curtail mail-order distribution was part of a unilaterally imposed system of nonprice restrictions. CPI must provide specific factual support for its allegations.

### 2. *Evidence of Concerted Action.*

CPI contends that HP did not act independently but in response to complaints

---

**2.** CPI received discounts on all its personal computer purchases in the first quarter of 1982. Ninety-five per cent of the promotional fund it received from HP was used to finance national advertising; only five per cent was used for local advertising.

**3.** In some instances, the profit margin of local dealers was as low as 3.8 percent before deducting support costs and other overhead expenses.

**4.** Paragraph 4(b) of the Dealer Terms and Conditions of Sale Section of the Dealer Agreement provides in relevant part:

"Dealer understands and agrees that HP may market other products, including products in competition with the computing or accessory products listed on the enclosed Product Exhibits or in addition to the computing or accessory products listed on the enclosed Exhibits without making such computing or accessory products available to Dealer."

Ebe Decl., Exh. 2.

from local dealers or demands by CL. It dismisses the Five Point Program as a sham and a major reversal of prior policy.

■ Last year, the Ninth Circuit addressed the combination requirement in dealer termination actions brought under the Sherman Act. "Something more than complaints and termination must be shown to overcome a motion for summary judgment * * * the additional showing can be made by either evidence of direct coercion or of a causal nexus between complaints and termination." *Filco, supra,* 709 F.2d at 1263. CPI has not alleged direct coercion. The relevant factors in determining the causal link are: (1) the volume and intensity of complaints; (2) the time gap between receipt of complaints and termination; and (3) whether the manufacturer had a valid, independent reason for terminating the discounting dealer. *Id.* at 1264. This test has been reinforced by the recent holding of the Supreme Court that there must be "evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Monsanto, supra,* 104 S.Ct. at 1471.

CPI contends that HP dealers complained about mail-order discounting. The deposition testimony of Stanley Podares, HP's Eastern Regional Sales Manager, is offered as evidence of these complaints. Mr. Podares did not assume his responsibilities until November 1, 1981, the same month that the Marketing Council adopted its "Distribution Objectives." Ebe Decl., Exh. 12. The simultaneous timing weakens the causal link CPI must establish. Furthermore, the testimony demonstrates that dealers complained about "free riding" rather than about price discounting.[5]

A summary of comments made by dealers in response to the November 1981 survey is also cited as evidence of complaints. When examined in context, it is again clear that local dealers were concerned about mail-order sellers benefiting from the support services of retailers.[6] Moreover, these statements were made in response to a survey initiated by HP. The Supreme Court has recently placed its imprimatur on the development of new marketing strategies.

"A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market. Moreover, it is precisely in cases in which the manufacturer attempts to further a particular marketing strategy by means of agreements on often costly nonprice restrictions that it will have the most interest in the distributors' resale prices. The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that "free-riders" do not interfere * * *.

\* \* \* \* \* \*

5. The "complaints" were described in the following testimony:

"Q. At that time, did you have any discussions with any HP dealer who complained to you that he had demonstrated an HP personal computer and then that computer was sold by a mail order dealer or other HP dealer at a lower price?

Mr. Ebe: Counsel, I have to object. We discussed yesterday you used the word 'complaint.' There's no testimony about any complaints, and that's a problematic word for the legal reasons.

Mr. Unikel: Q. Had you had any conversations with any HP dealer who expressed to you any dissatisfaction about having demonstrated an HP computer, personal computer to a customer and then that customer purchased a personal computer from a mail order seller or other HP dealer that discounted that product?

A. There were conversations relative to making the demonstration and losing the sale to mail order companies."

Podares Depo., p. 89, 11. 4–21, attached to Unikel Decl.

6. The summary states at ¶ 3A of Survey Observations:

The HP–85 is being discounted so heavily that the net margin is not profitable to the majority of dealers. Dealers have lost all incentive to promote our products. The few good dealers we have are seriously debating dropping our line."

Unikel Decl., Exh. 4, p. C02995.

[C]omplaints about price-cutters 'are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to activities of their rivals.' Such complaints, particularly where the manufacturer has imposed a costly set of nonprice restrictions, 'arise in the normal course of business and do not indicate illegal concerted action.' Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market."

*Monsanto, supra,* 104 S.Ct. at 1470. In light of this admonition, it would be anomolous to base a finding of concerted action on a marketing survey of local dealers initiated by a manufacturer.

CPI also attempts to develop its theory that the CL/HP contract signed on March 11, 1982, was conditioned on the elimination of mail-order sellers. Three pieces of evidence are offered to prove this combination: (1) notes from a February 2, 1982, meeting between HP and CL representatives; (2) a conference call wherein the CL

franchisees expressed concern about the mail-order dealers; and (3) the concurrent timing of the CL/HP contract and elimination of the mail-order dealers.

■ Robert W. Rogers, World-Wide Marketing Manager for the Personal Computation Group, represented HP at the February 2 meeting. His handwritten notes report statements made by Michael A. McConnell, President of the CL International Division. Mr. McConnell was reportedly "concern[ed]" that "custo[mers] are presold—[the] target for mail-order discount channels." Unikel Decl., Exh. 8. His own notes of that meeting contain the cryptic phrase "Discounter/m/o." Unikel Decl., Exh. 9. These two notations are the only evidence CPI has produced that mail order sellers were even discussed at the meeting.[7] Rogers' notes support the conclusion that CL was concerned its franchisees would presell HP customers who would then become a target for mail-order sellers. This is consistent with the testimony of all who attended the meeting. There is no evidence that CL expressed concern about the *price* at which mail-order dealers sold HP products. Concern about the "free riding" problem is a legitimate dealer complaint. *Monsanto, supra,* 104 S.Ct. at 1470.

On February 2, 1982, after meeting with HP, CL held a routine conference call with

---

7. In its brief, CPI argues that Al Oliverio, who "did most of the talking for HP" at the meeting, "understood" one of CL's requirements was elimination of mail-order sellers. Again, the deposition testimony relied on by CPI belies this interpretation.

"Q. Did you receive any response from any of the Hewlett Packard personnel in connection with your statements about margins, that the problem had always been margins? Did anybody respond to that?
A. To the best of my recollection, I believe that Al Olvierio let me know that he understood our concerns, or our needs. I considered that a very positive statement, but that's as far as we went in that meeting."
McConnell Depo., p. 60, 1. 25—p. 61, 1. 4, attached to Carr Decl.
"Q. Prior to Mr. Oliverio's making that statement to you, that he understood what your requirements were, did you tell him that one of ComputerLand Corp.'s requirements was

that HP take some action with regard to its mail order dealers?
A. No."
*Id.* at p. 69, 11. 19–24.
"Q. Do you recall, when Mr. Oliverio said to you, 'I understand your requirements,' at what point in the meeting that statement was made on February 2 of 1982?
A. First of all, I'm not sure that that was a direct quote. My recollection is that it was early on in the meeting. I couldn't be certain of that. And I know that either in the way he said it or the words he used, I felt he was referring to margin."
Q. And before he said it, did you say words to him to the effect that 'Computerland Corp. would not do business with Hewlett Packard unless it took some action with regard to its HP dealers who sold by mail order'?
A. No I would never have said that and did never say that. That wasn't true."
*Id.* at p. 102, 1. 23—p. 103, 1. 8.

its franchisees. CPI again cites handwritten notes taken by CL representatives during the call. These references support the conclusion that CL franchisees expressed concern to their franchisor about mail-order sellers and discounting. There is no evidence, however, that these concerns were communicated to HP, the manufacturer. To infer a conspiracy from these isolated and ambiguous memoranda would be contrary to the recent holdings of both the Supreme Court and the Ninth Circuit. *Monsanto, supra; Filco, supra,* 709 F.2d at 1264.

Nor does the fact that HP changed its marketing policy three months after entering a contract with CL prove they had the requisite "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto, supra,* 104 S.Ct. at 1471.

■ CPI contends that the Five Point Program recommended in June 1982 by the Task Force of HP's Marketing Council was mere camouflage. It bases this conclusion, in part, on a March 26, 1982, memorandum from Mr. Rogers that proposed many of the same strategies. This memorandum documented strategies discussed during a meeting between Rogers and John J. Regan, National Sales Manager for the HP Personal Computation Group, on March 2, 1982. The only evidence CPI has produced to connect CL to the development of the Five Point Program is that Rogers and Regan met nine days before the CL/HP contract was signed on March 11, 1982. Speculation based on coincidence is insufficient to raise a material issue of fact.

More generally, CPI argues that HP was feeling "pressure" from its dealers and from CL. It finds evidence of this pressure in the "major reversal" of HP's discount policy. The Stocking Incentive Policy ("SIP") was introduced in September 1981. It provided a 28 percent base discount and a 30 percent discount for three units or more. In January 1982, the base rate was increased to 30 percent, the rate for four to nine units was increased to 33 percent and the rate for ten or more units was increased to 33 percent. Unikel Decl., Exh. 15. The Five Point Program replaced this scale with a flat 33 percent rate for all dealers. This hardly constitutes a "major reversal" of the relatively new discount policy. Rather, it provides further evidence of HP's intention to ameliorate any discrimination against local dealers inherent in its distribution programs. The development of the Five Point Program is well documented and has been thoroughly reviewed above. The "pressure" HP reacted to was the response of its dealers to the November survey, many of whom were concerned about HP policies which allowed mail order sellers to "free ride" on local dealers.

Finally, CPI contends that HP knew eliminating mail-order selling was not in its own best economic interest. It relies on two staff memoranda which refer to possible short-term losses from a rebate program that HP did not adopt. The undisputed record shows that HP personal computer sales, through local dealers, in the latter half of 1981, were 40 percent higher than they were during the same period in the prior year.

HP has demonstrated that, beginning in 1981, it acted independently to develop a marketing strategy for its new line of personal computers. The new computers were designed to be used by inexperienced customers and required support services of a local dealer. The marketing program HP had developed when it sold calculators and products designed for sophisticated customers disadvantaged local dealers and was inadequate. HP's major competitors, such as Apple and IBM, had chosen to sell their new personal computers by local dealers rather than by mail order.

CPI has failed to produce "evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors acted independently." *Monsanto, supra,* 104 S.Ct. at 1471. Viewed in a light most favorable to CPI, the evidence shows that HP and the local dealers were concerned about mail-order sellers. The concern demonstrated, however, was that mail-

order sellers were taking advantage of and discouraging local dealers. The evidence also shows that the industry considered local dealer support essential to compete in the new personal computer market.

The record does not support a finding of illegal combination or conspiracy.

B. *Sherman Act § 2: Monopolization.*

CPI alleges violation of § 2 of the Sherman Act under two theories: defendants either conspired or attempted to monopolize the business and scientific computer market in the national market. Complaint at ¶¶ 19, 20.[8]

As discussed above, CPI has failed to provide specific facts to support the allegations of conspiracy contained in the complaint. Thus, it cannot sustain a claim for violation of § 2 of the Sherman Act under a conspiracy to monopolize theory.

■ Attempted monopolization has three elements: (1) a specific intent to control prices or destroy competition in the relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose; and (3) a dangerous probability of success. *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1373 (9th Cir.1983). CPI contends it has offered sufficient proof of anticompetitive conduct for the Court to infer the existence of the other two elements. Specific intent to monopolize and a dangerous probability of success may be inferred from certain types of conduct. However, the plaintiff must produce evidence of " 'conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or clearly exclusionary.' * * * [E]ven if the challenged practice could satisfy the conduct element of attempted monopolization, it cannot supply an inference of the other two elements." [9] *Id.* at 1374, *quoting Wil-*

*liam Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1030 (9th Cir.1981) (footnote omitted), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

■ The relationship between HP as a manufacturer and CPI as its distributor is vertical. Vertical restraints are ordinarily subject to rule of reason analysis. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 51 n. 18, 97 S.Ct. 2549, 2558 n. 18, 53 L.Ed.2d 568 (1977). CPI argues that a stricter standard of review is appropriate because the alleged conduct constitutes a *per se* violation. It attempts to characterize HP's conduct as price fixing, group boycott and resale price maintenance. The evidence does not support an allegation under any of these theories.

■ The Third Circuit has recognized that termination of a distributor by a manufacturer in response to complaints from other dealers about the terminated distributor's prices may amount to a *per se* violation of the Sherman Act. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979). The Ninth Circuit noted this reasoning but rejected its application in the absence of an allegation that the complaining dealer was "seeking to *eliminate price competition.*" *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1015 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983). As discussed above, CPI has failed to rebut evidence showing that the new distribution strategy, emphasizing local rather than mail-order dealers, was initiated by HP in response to market conditions rather than to dealer complaints. Comments made to an HP sales representative or in response to a questionnaire sent by HP are the only evidence of dealer "complaints". This conduct was explicitly sanctioned in *Monsanto*

---

8. The only theory argued in opposition to defendants' motion is attempted monopolization.

9. "[I]n general, conduct that will support a claim of attempted monopolization must be such that its anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the

firm's long-term ability to reap the benefits of monopoly power." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1030 (9th Cir.1981), *cert. denied*, [459 U.S. 825], 103 S.Ct. 57 [74 L.Ed.2d 61] (1982)."

and cannot be the basis of a *per se* violation.

A concerted refusal to deal with a particular dealer, commonly referred to as a "group boycott," also triggers *per se* analysis. *See e.g., Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The Court is urged to apply this doctrine to the instant case. However, CPI has failed to produce any viable evidence that HP and CL or its franchisees acted in concert. The cryptic notes of meetings and a phone conference do not demonstrate agreement, much less an agreement to boycott CPI or other mail-order sellers. Moreover, the *per se* rule is generally not applied when the alleged refusal to deal is vertical rather than horizontal. *Fine v. Barry and Enright Productions*, 731 F.2d 1394, 1398–1399 (9th Cir. 1984); *Cascade Cabinet, supra* at 1371.

Nor does the evidence support an allegation of a *per se* violation under a resale price maintenance theory. Termination or the threat of termination may be unlawful if it coerces a dealer to adhere to a fixed price. *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 804–805 (9th Cir.1976) *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). Although CPI alleges that it was terminated because it offered HP products at discount prices, the evidence it relies on to show coercion directly contradicts this conclusion. John J. Regan, National Sales Manager of the HP Personal Computation Group, explained the new program in a July 26, 1982, letter to Olympic Sales Co., Inc.: "The most important point I want to clarify is this: All of our dealers continue to be free to determine their own retail selling prices and to show those prices in their advertising." Plf.Exh. 203 at A01791–A01792.

Having failed to provide sufficient evidence of conduct constituting a *per se* violation of § 1, CPI must establish a substantial restraint under the Rule of Reason in order to infer the specific intent required to proceed with its claim of attempted monopolization. An unreasonable restraint under the Sherman Act has two elements: (1) intent to harm or unreasonably restrain competition; and (2) actual injury to competition. *Fine, supra*, 731 F.2d at 1399; *Cascade Cabinet, supra*, 710 F.2d at 1373.

"[I]njury to the antitrust plaintiff alone is not sufficient to prove injury to competition." *Robert's Waikiki U-Drive Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403, 1408 (9th Cir.1984). To allege such injury, a plaintiff must begin by defining the relevant market. *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).[10]

A "relevant market" is defined by "the product involved, the geographical limits within which it functions and the appropriate time frame." *General Business Systems, supra*, 699 F.2d at 972. The only disputed element in this case is the product involved. HP defines the relevant market as the entire personal computer market. CPI contends that the relevant market is the technical/professional submarket.[11]

---

**10.** Market definition is an essential element of a § 1 violation under the rule of reason. Such evidence is also required in an attempted monopolization claim where the plaintiff seeks to infer specific intent and a dangerous probability of success from anticompetitive conduct that does not constitute a *per se* violation. *California Computer Products Inc. v. International Business Machines Corp.*, 613 F.2d 727, 737 n. 10 (9th Cir.1979). While technically complete proof of market power is not required where direct proof of these elements is offered, *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), some evidence establishing the relevant market is essential to an evaluation of the specific intent to control prices and eliminate competition alleged by CPI. *M.A.P. Oil Co. v. Texaco, Inc.*, 691 F.2d 1303 (9th Cir. 1982).

**11.** CPI pleaded the relevant product market as "business and scientific computer." Complaint at ¶¶ 19 and 20. Defendants argue that redefinition of this market as "technical/professional" is improper and that plaintiff is bound to its pleading by Federal Rule of Civil Procedure 11. This rule requires a reasonable inquiry into the facts underlying allegations; it does not in-

The standards for defining product markets and submarkets were set forth in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1961):

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593–595 [77 S.Ct. 872, 877–878, 1 L.Ed.2d 1057]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

CPI's definition of the technical/professional submarket is primarily based on a study of the personal computer industry conducted by Data Quest, an industry research organization. A June 1981 Data Quest report defines a personal computer as a "computer with a list price of between $200 and $5000 that is used by the individual for personal applications." The report lists five different applications or uses for the personal computer: business, technical/professional, education, hobby, and home. HP sold 39 percent of the personal computers identified by Data Quest as the "technical/professional segment." This segment is defined as "use of personal computer for computer assisted problem-solving, or engineering design by individuals." Plf.Exh. 117.

▇▇▇▇ It is clear from its definitions that the Data Quest report analyzes the market for one product—personal computers. The market is broken down into groups designated by customer application. CPI relies on this evidence to establish a technical/professional submarket but it has failed to produce evidence of the practical indicia required by *Brown*. For example, it has offered no evidence that the technical/professional products have peculiar characteristics or are produced at unique facilities.[12] Although the market is segmented by application, no evidence has been offered that customers in the various categories are distinct. The only evidence about price is the testimony of CPI's President David Stihler that professional/engineering customers had no interest in comparatively inexpensive computers and that customers in the various markets were relatively insensitive to price changes.[13] This vague and conclusory testimony is insufficient to establish a well-defined submarket on summary judgment.[14] *Casey v. Diet Center,* 590 F.Supp. 1561 (N.D.Cal.1984). There is nothing to rebut the evidence offered by HP that personal computers are reasonably interchangeable.

crease the requirements of Rule 8. The Court finds this pleading sufficient to notify the defendants of the claims now argued.

12. The summary of the November 1981 dealer survey, heavily relied on by CPI, supports the conclusion that *one* product, the HP–85, was broken down into several customer markets. Plf. Exh. 5, at C02301. CPI's description of HP's product line and method of distribution reinforces this conclusion.

> "The HP–85 is a microcomputer, commonly referred to as a 'personal computer.' It is an integrated, self-contained unit in the sense that it had a built-in memory, a built-in printer and a built-in monitor (television screen). The HP–85 was sold to all who sought to purchase it (and who could pay for it); but it

was bought primarily by engineers and scientists who had some prior experience with computers. When first introduced, the HP–85 carried an HP suggested list price of approximately $3,250.00."
Appendix of Facts, p. 4, 11. 9–17.

13. The Appendix of Facts, quoted in note 12, *supra,* supports the conclusion that there was a unitary list price for the HP–85, regardless of customer application.

14. CPI has offered similar evidence from the HP dealer survey summary. 57.6 percent of the dealers surveyed stated that price was not important to the technical/professional customer. Again, the summary only reflects responses to *one* product, the HP–85. Plf. Exh. 5 at C02301.

In the absence of competent evidence of a technical/professional submarket, the Court must consider the entire personal computer market to be the relevant product market. During 1982, HP had a 3.6 percent share of that market, measured in terms of units sold, and a 5.8 percent share, measured in terms of dollars earned. Neither of these shares gives HP sufficient power to influence competition in the personal computer market as a matter of law.

## II. *Robinson-Patman Act § 2(a): Price Discrimination.*

■ Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), prohibits illegal price discrimination. *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau,* 701 F.2d 1276 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 88, 78 L.Ed.2d 96 (1984).[15] It is undisputed that HP agreed to sell products to CL at 40 percent below list price while it sold to CPI at 35 percent below list. However, to establish a Robinson-Patman violation, CPI must prove that this discrimination had an adverse effect on competition. *William Inglis, supra,* 668 F.2d at 1040. CPI has failed to produce evidence of competitive injury.

CL functions as a wholesaler. It purchases computer products and accessories from a manufacturer and resells those products to its franchisees. CL franchisees sell the products at retail. HP agreed to sell its products to CL at 40 percent below list price. The CL franchise contract allows franchisees to buy HP products at 40 percent below list but obligates them to pay an additional 8 percent of their gross sales as a royalty fee and .5 percent toward a national advertising fund. The undisputed evidence shows that CL franchisees ef-fectively paid between 31.5 percent and 33 percent off list price for HP products while CPI bought HP products for 35 percent off list price.

■ CPI urges the Court to compare the 40 percent discount given to CL with the 35 percent discount it received. It is the CL franchisees, however, who were competitors of CPI. Had CL merely passed along the 40 percent discount and not charged its franchisees the 8 percent royalty, there would be evidence of competitive injury. *Perkins v. Standard Oil Co. of California,* 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969). This record, however, will only support one conclusion. The price advantage was not passed along; there was no competitive injury.

## III. *State Claims.*

CPI alleges three pendent state claims: promissory or equitable estoppel, tortious interference with business relations, and tortious interference with contractual relations.

### 1. *Estoppel.*

In count IV, CPI claims that HP is estopped by prior promises to deny CPI new models of HP personal computers. However, the written Dealer Agreement, signed by CPI's President David Stihler in November 1981, expressly allowed HP to market products without making them available to the dealer.[16] CPI contends that this contract was not a fully integrated contract. It argues that the mail order arrangement with HP was based on a prior consistent oral agreement. This argument falls of its own weight.

■ The Dealer Agreement has an express integration clause.[17] Antecedent

---

**15.** CPI originally alleged violations of the Robinson-Patman Act by discrimination in "credit allowances," "advertising allowances," "preferential shipments" and "other discounts, allowances and opportunities." Complaint at ¶ 24. Only the price discrimination claim is pressed in opposition to summary judgment.

**16.** *See* n. 4, *supra.*

**17.** Paragraph 12(d) provides in relevant part: "[T]his Agreement and the attached Exhibits contain the entire and only understanding between the parties relating to the subject matter hereof * * *. [N]o modification hereof shall be binding upon either party unless made in writing and signed by both parties." Ebe Decl., Exh. 2.

understandings and parol evidence are not admissible to alter the terms of an unambiguous integrated contract. *Golden Gate Acceptance Corp. v. General Motors Corp.*, 597 F.2d 676, 680 (9th Cir.1979); Cal.Com.Code § 2202; Cal.Code Civ.Pro. § 1856(a).

### 2. *Tortious Interference with Business Relations.*

CPI pleads this cause of action by incorporating paragraphs from the antitrust and estoppel counts. Thus, it is clearly based on the same conduct. The refusal of HP to supply CPI with its new computers allegedly interfered with relations between CPI and its customers. As discussed above, HP exercised its express right under the written Dealer Agreement when it decided to distribute the new models only to local dealers. The exercise of a contractual right cannot be the basis for a claim of tortious interference. *Lawless v. Brotherhood of Painters, Decorators & Paperhangers of America*, 143 Cal.App.2d 474, 478, 300 P.2d 159 (1956).

### 3. *Tortious Interference with Contractual Relations.*

In Count VI, CPI claims that CL "intentionally and maliciously induced HP to breach and terminate its contractual and ongoing business relationship with CPI." Complaint at ¶ 40. There has been no attempt to brief this issue. It is obviously based on the conduct alleged in the Sherman Act counts. CPI has failed to produce competent evidence that CL induced HP to take any action which affected CPI.

Accordingly, IT IS HEREBY ORDERED that summary judgment is granted on all claims.